AMERICAN HOME PRODUCTS CORPORATION, Plaintiff,

v.

JOHNSON & JOHNSON, McNeilab, Inc., Saatchi & Saatchi Compton, Inc., and Kallir Philips Ross Inc., Defendants.

No. 85 Civ. 4858 (WCC).

United States District Court, S.D. New York.

Nov. 5, 1987.

Arnold & Porter, Washington, D.C. (Stuart J. Land, Jack Lipson, Thomas J. McGrew, Douglas A. Dworkin, Peter Kautsky, Duane K. Thompson, Randal M. Shaheen, Eric A. Rubel, of counsel), Morrison & Foerster, New York City (Jack C. Auspitz, Kim J. Landsman, Charles F. Hagan, William P. Woods, Egon E. Berg, of counsel), for plaintiff.

Patterson, Belknap, Webb & Tyler, New York City (David F. Dobbins, Gregory L. Diskant, Peter Mahler, Rhonda B. Parker, of counsel), for defendants.

## OPINION AND ORDER

WILLIAM C. CONNER, District Judge:

This is yet another engagement in what this Court has termed "an endless war between two titans of the over-the-counter ('OTC') drug industry" to establish "commercial primacy in the OTC analgesic field." *American Home Products Corp. v. Johnson & Johnson*, 654 F.Supp. 568, 571–72 (S.D.N.Y.1987). The claim presently under consideration is the ninth counterclaim in an action brought by American Home Products Corporation ("AHP"), which, through its Whitehall Laboratories Division, markets Anacin, Maximum Strength Anacin ("MSA"), and Advil, against Johnson & Johnson ("J & J"), its wholly-owned subsidiary, McNeilab, Inc. ("McNeil"), maker of Tylenol, and their advertising agencies, under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) and state unfair competition law, charging falsity in advertising claims of superior efficacy and safety of its OTC (non-prescription) internal analgesics. In its answer, McNeil asserted a number of counterclaims under the same laws, charging falsity in various AHP advertising claims. Because the ninth counterclaim was added by amendment only a short time before the action was set for trial, and because it involved entirely different issues, it was severed for separate trial.

The ninth counterclaim seeks an injunction and damages to compensate for profits allegedly lost by McNeil because the labels used on Anacin and MSA packages prior to 1986 failed to warn that children and teenagers with viral diseases, such as influenza and chicken pox, who took such aspirin-containing products incurred a significant risk of contracting Reye Syndrome ("RS"), a serious and frequently fatal disease. McNeil further charges that even after 1986, when AHP added to the back of the Anacin and MSA packages a warning of the danger of RS, as then mandated by the U.S. Food and Drug Administration ("FDA"), the packages were still misleading in that the word "SAFE" was prominently displayed on the front of the packages.

AHP has moved for summary judgment dismissing the ninth counterclaim on the ground that the suspected causal connection between salicylates, such as aspirin, and Reye Syndrome was the subject of good-faith controversy among medical and pharmacological experts until 1986, when the FDA promulgated its regulation requiring an RS warning on packages of aspirin-containing OTC products, at which time AHP and other manufacturers of such products promptly and fully complied. A year earlier, while FDA hearings on the salicylate-RS controversy were in progress, AHP had voluntarily followed an FDA suggestion that the packages of such products bear a milder warning that a physician should be consulted before giving the medicine to children or teenagers with chicken pox or flu. AHP urges that it cannot be ruled liable for failing to warn of a danger which was not medically established but was the subject of debate among neutral experts and under active consideration by the federal agency charged with the responsibility for insuring that packages of OTC medicines give adequate instructions as to applications, dosages and contraindications.

In opposition to the motion McNeil urges that by the early 1980s, the causal relation

between salicylates and RS was sufficiently established, or at least so strongly indicated, that a responsible OTC drug manufacturer should have voluntarily affixed an RS warning on the packages of its aspirin-containing products without waiting for the FDA to promulgate a mandatory labeling requirement and that, even after the warning was added, the packages still conveyed a misleading overall message of safety, and that these factual issues preclude summary disposition.

For the reasons discussed hereinafter, the motion for summary judgment is granted.

*Factual background*

The following facts are deemed admitted for purposes of the present motion, having been set forth in AHP's Statement under Civil Rule 3(g) of this Court[1] and not controverted by McNeil's answering statements, *see Vitabiotics, Ltd. v. Krupka,* 606 F.Supp. 779 (E.D.N.Y.1984):

Anacin and MSA are OTC (non-prescription) internal analgesics whose principal active ingredient is aspirin (acetylsalicylic acid). Prior to 1985, the packages of Anacin and MSA, like those of other aspirin-containing products, bore no statements about Reye Syndrome.

Reye Syndrome ("RS") was first described in 1963 by the Australian pathologist, Douglas Reye. The disease, which is characterized by acute swelling of the brain and fatty degeneration of the liver, affects only children and teenagers. Despite intensive scientific research, the precise etiology of RS has not been determined.

In the late 1970s and early 1980s, the state health departments in Arizona, Ohio, and Michigan undertook four retrospective epidemiological studies of RS exposure factors. These studies attempted to assess the relationship, if any, between RS and a number of variables by comparing the histories of individuals who had been identified as having RS with similar control groups to determine the relative frequency of occurrence of these variables. The reports of these four studies indicated an association between RS and the ingestion of aspirin during an antecedent viral illness. These state studies have, however, been criticized for specific deficiencies in design, execution, and analysis.

From the time the results of these four state studies were announced, there was considerable dispute among medical professionals and scientists as to whether the ingestion of aspirin was causally related to the incidence of Reye Syndrome. During 1981 and 1982, a series of conferences were convened by the Centers for Disease Control ("CDC") and the National Institutes of Health ("NIH"), as well as by interested private organizations, to review the results of the state studies, and to assess the available scientific evidence concerning the cause or causes of Reye Syndrome.

On June 4, 1982, the Secretary of Health and Human Services ("HHS") issued a press release stating that the state studies indicated a possible association between salicylates and RS; the Secretary directed the FDA to develop precautionary programs aimed at medical care personnel, pharmacists, and parents. Thereafter, the FDA undertook such an educational campaign.

On September 17 and 29, 1982, Congressional hearings were held at which physicians, and other scientists familiar with RS, testified. Several scientists who testified were very critical of the methodology employed in the state studies and expressed the view that there was no scientific justification for imposing an RS warning label on aspirin. Most called for further research.

On September 20, 1982, the Secretary of HHS announced that the FDA was considering whether to issue regulations to require an RS warning statement on salicylate-containing products. On November 8, 1982, the American Academy of Pediatrics ("AAP"), through its Executive Board, issued a statement recommending against

---

**1.** Civil Rule 3(g) provides in relevant part:
   All material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party.

such a label warning. The Academy's statement read in part:

There should be cautious use of any antipyretic medication in the treatment of influenza or chicken pox. However, *at the present time, we do not feel that labeling aspirin containing preparations as being contraindicated in these illnesses is in the best interest of children or the practice of pediatrics.*" (Emphasis supplied.)

The AAP took the position that further investigation of this issue was needed. Dr. James Strain, the then-President of the AAP, explained that there were two reasons for the AAP position:

Those two bases were [first] serious unresolved doubts as to the scientific validity of the state studies and secondly, concern that a label warning would interfere with the use of aspirin in treating conditions in children where it's clearly indicated.

According to testimony by the responsible FDA official, the AAP statement convinced the FDA that there existed "a high degree of scientific controversy on the matter." The AAP statement "flagged for us [FDA] that there was probably more controversy on this issue than we had appreciated." As a result, the Secretary agreed that new government-supported studies "are necessary to help resolve a scientific dispute over the reported link between RS and salicylate-containing drugs."

Accordingly, the Public Health Service was directed by the Secretary to recommend new research in order to resolve the scientific controversy. The Secretary also announced that he would issue an Advance Notice of Proposed Rulemaking ("ANPR") "setting forth all information currently available on Reye Syndrome and Salicylates and inviting comments on the significance of this information and whether a proposed warning label ... should be required."

The FDA published the ANPR on December 28, 1982. 47 Fed.Reg. 57,886 (1982). The Notice emphasized that reliable scientific studies were needed to determine whether a clinically significant relationship existed between RS and aspirin. Copious comments on the ANPR were received from a variety of sources including public bodies, physicians, medical associations, epidemiologists, aspirin manufacturers, public interest groups and others. These comments reflect the unsettled scientific questions at the time with respect to Reye Syndrome. Johnson & Johnson's Vice Chairman, David Collins, has conceded that this scientific dispute was in good faith and was based on differing but nonetheless reasonable views on a complex scientific issue.

McNeil filed no statement of its own in the FDA rulemaking proceeding. Instead, it joined in a statement that was filed by the Proprietary Association ("PA"), an association of OTC drug manufacturers in which McNeil is one of nine companies occupying permanent seats on the Executive Committee and the Board of Directors and to which McNeil is a substantial financial contributor.

At a meeting of the PA Executive Committee in January 1983, Mr. Collins of Johnson & Johnson spoke against including a Reye Syndrome warning on aspirin labels. Moreover, Collins approved and supported the PA statement, which was filed with the FDA on February 28, 1983, and which opposed any Reye Syndrome warning on aspirin.

The FDA decided not to require a Reye Syndrome warning label because of this scientific dispute. Its reasons were stated in a sworn interrogatory answer filed October 24, 1984 in another suit. The FDA said:

The major reason FDA did not issue a final decision concerning whether or not salicylate-containing drugs should be labeled to warn about the possible association between salicylates and Reye Syndrome is that *there is currently uncertainty about whether the reported statistical association between Reye Syndrome and aspirin has any reasonable clinical significance. A statistical association does not necessarily imply causation.* Defendants' Answer to Interrogatories and Document Production

Request, *Public Citizen Health Research Group v. Hayes*, No. 82–1346 (D.D.C.1983), *affirmed and remanded, Public Citizen Health Research Group v. Commissioner*, 740 F.2d 21 (D.C.Cir. 1984). (Emphasis supplied.)

The FDA also stated:

the agency was in November of 1982 and is now [October 1984] aware of considerable disagreement in the scientific community as a whole concerning whether the evidence sufficiently establishes a clinically significant association between Reye Syndrome and aspirin. The agency believes that these disagreements between reputable experts emphasize the uncertainty of the current data. It is therefore prudent to await the results of the additional study that is now underway before issuing a final decision on whether to require label warnings.

As a result of the responses to the ANPR, a government task force was formed in April 1983 consisting of representatives from the FDA, CDC, NIH and the Office of the Assistant Secretary for Health to study the possible relationship between the use of salicylates and RS, and to formulate a protocol for a comprehensive study. 48 Fed.Reg. 15,331 (1983). This led to a plan by the U.S. Public Health Service for a new, case-control study; this "main" study was to be preceded by a feasibility or "pilot" study to establish appropriate methodology. The primary object of the new study was to accomplish a research program free of the challenges against the earlier state studies, in order to determine whether an association existed between aspirin and RS, and whether a warning label was scientifically warranted. 50 Fed.Reg. 51,400, 51,401 (1985).

The FDA's decision not to require any changes in aspirin labeling pending completion of additional research has been upheld by the federal courts. In March 1983, the United States District Court for the District of Columbia (Judge John Garrett Penn) entered summary judgment dismissing the above-cited action against the FDA. Judge Penn held that "there are sufficient questions [concerning a possible relation between RS and aspirin] so that further consideration of the issue [by FDA] cannot be held to be an unreasonable delay." *Public Citizen Health Research Group v. Hayes*, No. 82–1346, Mem.Op. at 5 (D.D.C. 1983). Judge Penn concluded by stating that "this Court ... should not substitute its judgment for those of the experts."

HRG appealed this dismissal and on July 27, 1984 the United States Court of Appeals for the District of Columbia Circuit upheld Judge Penn's decision, but remanded the case to assure that FDA would act expeditiously in its further consideration of a possible warning label. *Public Citizen Health Research Group v. Commissioner*, 740 F.2d 21 (D.C.Cir.1984). The Court of Appeals opinion reviewed the history of the four state studies, noted that "the exact cause of Reye's Syndrome is unknown," and observed that courts are ill equipped to decide disputed issues of medicine and science and that they commonly await an appropriate administrative declaration by the FDA before acting. The Court said:

This principle should apply with equal force in the present circumstances. Whether the association between salicylates and Reye's Syndrome is sufficiently strong to require a rule mandating warning labels is a question whose resolution demands FDA's medical expertise in the first instance....

On January 9, 1985, the Secretary of HHS announced the results of the PHS Pilot Study in a news release stating that the study was not completely conclusive but that its findings did show an association between the use of aspirin and the onset of Reye Syndrome in children and teenagers.

In that same announcement the Secretary put into effect a program which involved both government and industry. On the industry level, the Secretary asked aspirin manufacturers to label aspirin products with a warning which would direct that aspirin not be used to treat flue or chicken pox in children and teenagers unless a physician is first consulted.

The Secretary stressed that there was no negative implication concerning the general

safety of aspirin as an OTC medication. She said:

I want to emphasize that this step does *not* mean that aspirin is unsafe for other uses. Aspirin is, in fact, a tremendously valuable and effective analgesic and anti-inflammatory drug that has, will and should continue to be used by tens of millions of Americans safely. But as with any other drug, it is crucial that aspirin be administered appropriately.

Within two days of the Secretary's announcement, AHP agreed to the voluntary labeling program. In two weeks the FDA approved the text of a warning label reading:

Contact a physician before giving the medicine to children including teenagers with chicken pox or flu. 50 Fed.Reg. 51,400, 51,401.

On January 11, 1985, the Secretary sent a mailgram to AHP's Whitehall Laboratories Division "to commend your prompt and public-spirited response to my request for cooperation by the aspirin industry to help reduce the risk of Reye Syndrome."

As part of the voluntary program, AHP and the other members of the Aspirin Foundation also undertook a major public information program which involved the production and distribution of warning posters, video tapes and radio tapes.

By August 31, 1985—*i.e.*, prior to the start of the 1985 flu season—100 percent of all Anacin and MSA packages being shipped to retail establishments bore the new voluntary label.

The PA endorsed the voluntary program as an appropriate and sufficient response to the Reye Syndrome issue. The PA's position is reflected in comments which it filed with the Federal Trade Commission ("FTC") in mid–1985, in opposition to a petition submitted by HRG, which urged the FTC to require an RS warning in advertisements for aspirin products. McNeil's chief executive officer, Joseph Chiesa, and J & J Vice Chairman David Collins opposed such a warning requirement and supported the PA's opposition. The PA statement pointed out that the "ongoing informational programs" by the aspirin manufacturers and the Department of HHS "represent a far more effective vehicle for communicating with the public than advertised warnings." The PA statement declared, "these programs [including the voluntary labeling by aspirin manufacturers] are effectively informing consumers about Reye's Syndrome...."

The PA Statement filed with the FTC stated that "warnings on aspirin advertising would be unjustified and unnecessary." The Statement denied that any aspirin manufacturer had misled consumers about material attributes of its product, and pointed out that the omission of a Reye Syndrome warning could not be considered deceptive:

Since aspirin products are clearly fit for ordinary use, the omission of a Reye's Syndrome warning from aspirin advertising does not satisfy the stringent conditions under which a manufacturer's silence will be considered deceptive.

In 1985, McNeil supported efforts to defeat legislation which would have required designated Reye Syndrome warnings on aspirin products.

In December 1985, the FDA published a notice of proposed rulemaking as a predicate to the establishment of a mandatory RS warning. 50 Fed.Reg. 51,400 (1985). There was an express finding that while the voluntary program had been successful, a nationally uniform warning was needed. The FDA notice said:

In proposing this regulation, FDA is aware that the voluntary labeling program undertaken by the aspirin industry together with FDA has been successful and has resulted in the labeling of many of the drugs which would be covered by this proposed regulation. *Id.* at 51,403.

The FDA stated that the voluntary program of the aspirin industry, including relabeling,

has done much more in a relatively brief period of time to inform and caution the general public about Reye Syndrome and the possible association of the disease with aspirin use than the most ambitious mandatory program alone could have

done in the same time frame. *Id.* at 51,402.

The Notice indicated, however, that FDA had concluded that a nationally uniform warning would best serve the public interest. *Id.* at 51,403. Accordingly, FDA proposed a regulation to require that a uniform RS warning statement appear as the first statement in the "Warning" section of labels for aspirin preparations. The warning would state:

Children and teenagers should not use this medicine for chicken pox or flu symptoms before a doctor is consulted about Reye Syndrome, a rare but serious illness. *Id.* at 51,402.

In a further measure to promote uniformity, the regulation was to provide expressly that state regulations or requirements that were not identical were to be preempted. *Id.* at 51,403; *see* 51 Fed.Reg. 8180, 8181 (1986).

In addition, the FDA proposed to make one change in aspirin indications—namely, the deletion of flu or chicken pox as an indication on *pediatric* aspirin products.

The proposed FDA mandatory warning was adopted with implementing regulations on March 7, 1986 and became effective on June 5, 1986. 51 Fed.Reg. 8180 (1986). In issuing these regulations, the FDA expressly rejected suggestions that changes be made in the indications of *non*-pediatric aspirin products. *Id.* at 8182.

The FDA regulation expressly displaces all non-identical state labeling requirements. It declares,

FDA intends that the regulations issued in this document preempt State and local packaging requirements that are not identical to it with respect to oral and rectal OTC aspirin-containing drug products for human use. 51 Fed.Reg. 8181 (1986).

The FDA also intended that "it is in the best interest of the consumer, industry, and the marketplace to have uniformity in presentation and clarity of message." 50 Fed.Reg. 51,400, 51,402 (1985). It proposed a specific, mandatory label warning, in order "to increase consumer awareness,

avoid public confusion, and achieve uniformity in the marketplace...." *Id.*

The FDA also rejected suggestions (akin to those now made by McNeil) that references to the Reye Syndrome warning should appear elsewhere on the aspirin package:

FDA does not agree that an additional statement should be required in the "Indications" section or that a cross-reference is needed. FDA believes that the placement of the required warning statement as the first warning under the "warning section" is an appropriate method of conveying the information to teenagers who may use adult aspirin products and to those who may consider the use of these products to treat children with flu or chicken pox. 51 Fed. Reg. 8180, 8182 (1986).

Starting as early as January 1986, AHP has used the FDA-mandated warning on all Anacin and Maximum Strength Anacin packages. On three occasions the FDA has inspected Anacin packages for compliance with RS warnings, twice during the voluntary warning period in 1985, and once during the mandatory warning period in 1986. The FDA has never questioned AHP's compliance with either the voluntary or the mandatory standard. On the most recent occasion, when the FDA inspected the Anacin package which carried the mandatory 1986 warning, as well as the phrase "Safe, Fast Pain Relief," the FDA report stated that AHP was in full compliance.

McNeil does not challenge the current Anacin and MSA package labels which carry the same mandatory Reye Syndrome warning, but which do not use the term "safe." "Safe" is a commonly featured claim on the packages of OTC medicines, including aspirin. McNeil itself uses it on Tylenol and other products despite contraindications for limited classes of users.

The FDA's Proposed Monograph for OTC Internal Analgesic, Antipyretic and Antirheumatic Products, 42 Fed.Reg. 35,-346 *et seq.* (1977), declares that aspirin is a so-called "Category I" drug—one which is "generally recognized as safe and effective

and not misbranded." *Id.* at 35,382. The FDA Panel which authored the proposed Monograph stated that "aspirin is a safe and effective OTC analgesic when taken in the recommended dosage...." *Id.*

In its initial counterstatement under local Civil Rule 3(g), McNeil did not discuss, much less challenge, any of the foregoing facts which had been set forth in AHP's statement of the facts which it believed were not in dispute. On July 29, 1987, at a pretrial conference in another of the actions between the same parties, the Court observed that, pursuant to Rule 3(g), it would accordingly treat all of these facts as established for purposes of AHP's motion for summary judgment. McNeil's counsel expressed surprise and indicated that McNeil would belatedly file a supplemental counterstatement challenging a number of the facts contained in AHP's Rule 3(g) statement. This was done on August 31, 1987.

However, McNeil's counterstatement, instead of contradicting any of the facts recited above, has attempted to avoid their impact by asserting, in essence: (1) that the criticisms of the four state epidemilogical studies came largely from persons associated with the Aspirin Foundation, a trade association of aspirin manufacturers; (2) that these four state studies, together with a number of other investigations, including some as early as 1970, had convinced virtually all independent and informed scientists that there was a definite causal relation between salicylate ingestion and RS; (3) that the recommendation of the American Academy of Pediatrics against a mandatory RS warning on the labels of aspirin-containing products was the result of intense pressure from the Aspirin Foundation; (4) that the failure of the FDA to require an RS label warning prior to 1986 was likewise caused by high-pressure lobbying by the Aspirin Foundation (McNeil concentrates its fire on the lobbying efforts of the Aspirin Foundation, ignoring those of the Proprietary Association in which it participated); and (5) that McNeil joined in the opposition by the Proprietary Association to an RS labelling requirement only on "philopophical grounds"—namely that

there should be "no such requirement without full disclosure ... of the data upon which the FDA relied."

At the July 29, 1987 pretrial conference, the Court indicated that in their briefs on the motion, the parties had devoted scant discussion, if any, to an issue which the Court viewed as potentially dispositive: whether a competitor has a cause of action under the Lanham Act based on the failure of an OTC drug manufacturer to include on the packages of its product a warning of a possible adverse side effect of the drug, where the existence of the side effect was the subject of scientific dispute and of intensive investigation by the FDA, which had found that no such warning was called for. The parties filed supplemental briefs and affidavits on this issue in August and September 1987.

*Discussion*

In its briefs on this issue, McNeil relies upon a group of state law product liability cases ruling that a consumer who is injured as a result of using a dangerous product may recover damages against the manufacturer, despite the fact that the governmental agency charged with responsibility for testing such products and clearing them for sale to the public had found the product safe and had specifically approved the packaging and user instructions with which it was sold.

In *Wells v. Ortho Pharmaceutical Corp.*, 788 F.2d 741 (11th Cir.), *cert. denied,* —— U.S. ——, 107 S.Ct. 437, 93 L.Ed.2d 386 (1986), the Court ruled that even though the FDA had concluded that there was insufficient scientific evidence linking the use of Ortho's spermicidal jelly to birth defects to require a label warning of such a hazard, this did not bar recovery under state tort law.

In *Stevens v. Parke, Davis & Co.*, 9 Cal.3d 51, 107 Cal.Rptr. 45, 53–4, 507 P.2d 653, 661–62 (1973), the court ruled that state law permitted recovery by one suffering aplastic anemia as a result of taking chloromycetin, despite the fact that the product bore an FDA-approved label notice reading, "Warning—Blood dyscrasias [dis-

orders] may be associated with intermittent or prolonged use. It is essential that adequate blood studies be made." The court stated, "mere compliance with regulations or directives as to warnings, such as those issued by the United States Food and Drug Administration here, may not be sufficient to immunize the manufacturer or supplier of the drug from liability. The warnings required by such agencies may be only minimal in nature...." 107 Cal.Rptr. at 53, 507 P.2d at 661.

Similarly, in *O'Gilvie v. International Playtex, Inc.*, 821 F.2d 1438, 1441 n. 2, 1442–43 (10th Cir.1987), the manufacturer of high absorbency tampons had complied with the letter of an FDA warning requirement by placing on its packages the statement, "Attention: Tampons are associated with Toxic Shock Syndrome (TSS). TSS is a rare but serious disease that may cause death. Read and save the enclosed information." The court ruled that this did not shield the manufacturer from liability, stating, "Compliance [with FDA standards] is not dispositive ... if ... a reasonable manufacturer would have done more." 821 F.2d at 1443.

And in *Torsiello v. Whitehall Laboratories*, 165 N.J.Super. 311, 398 A.2d 132, 139–40 & n. 4, *cert. denied*, 81 N.J. 50, 404 A.2d 1150 (1979), the court ruled that one who suffered gastrointestinal bleeding from prolonged use of Anacin, the very product here involved, could recover damages for this injury despite specific approval of the package label by the FDA.

In its responsive brief, AHP cites an even larger group of cases ruling to the contrary. But this Court need not choose between these conflicting decisions. Rulings in product liability cases are simply not controlling in a Lanham Act action such as the one at bar. McNeil has not cited, and we have not found, any decision in which a product manufacturer has recovered under the Lanham Act for its alleged loss of profits resulting from the failure of a competitor to mark its product with a warning of hazards involved in its use.

There are a number of reasons why the doctrine of the product liability cases relied on by McNeil should not be extended to commercial litigation. In the first place, a person injured by the use of a dangerous product usually has played no role in, nor even had any knowledge of, the proceedings which led to the regulatory agency's approval of the product and its label. By contrast, the manufacturer of the product, typically supported by a powerful trade association, has substantial input into and influence over the regulatory process. It would be manifestly unfair if a person grievously injured by the use of an unsafe product without adequate warning of the hazard, should be denied recovery merely because the manufacturer's trade association, through aggressive lobbying, had succeeded in persuading the regulatory agency that the hazard was not sufficiently well established to require a label warning.

The same equitable considerations do not apply in favor of a competing manufacturer whose only injury is purely economic, and who had notice of the proposed agency action and an opportunity to be heard in opposition thereto. The equitable factors disappear altogether or even apply negatively where, as here, the competitor joined in the trade association's efforts to convince the regulatory agency that the hazard was merely speculative and that a label warning should not be mandated.

The Court of Appeals for the Second Circuit has repeatedly distinguished between the purposes of the Lanham Act and those of laws designed for the protection of consumers. For example, in *Colligan v. Activities Club of New York, Ltd.*, 442 F.2d 686, 691–92 (2d Cir.), *cert. denied*, 404 U.S. 1004, 92 S.Ct. 559, 30 L.Ed.2d 557 (1971), the Court, after noting that in the Lanham Act and its legislative history, there is "no mention at all ... of the 'public' or of 'consumers'" but only the protection of "'persons engaged in commerce against unfair competition,'" stated:

> We conclude, therefore, that Congress' purpose in enacting § 43(a) was to create a special and limited unfair competition remedy, virtually without regard for the interests of consumers generally and almost certainly without any consideration

of consumer rights of action in particular.

See also *PPX Enterprises, Inc. v. Audiofidelity, Inc.*, 746 F.2d 120, 124 (2d Cir.1984); *Alfred Dunhill Ltd. v. Interstate Cigar Co.*, 499 F.2d 232, 236 (2d Cir.1974).

Thus there is no logical basis for importing into Lanham Act litigation doctrines developed in consumer product liability cases.

In unfair competition actions under state statutory or common law, it has been consistently ruled that compliance with FDA warning requirements is a complete defense. McNeil's ninth counterclaim in this action is expressly based not only on the Lanham Act but on sections 349 and 350 of the New York General Business Law, which codify the New York law of Unfair Competition and deceptive advertising.

Section 349(d) specifically provides in relevant part:

> [I]t shall be a complete defense that the [deceptive] act or practice is, or if in interstate commerce would be, subject to and complies with the rules and regulations of, and the statutes administered by, the federal trade commission or any official department, division, commission or agency of the United States as such rules, regulations or statutes are interpreted by the federal trade commission or such department, division, commission or agency or the federal courts.

Section 350–c contains a similar provision:

> [I]t shall be a complete defense that the advertisement is subject to and complies with the rules and regulations of, and the statutes administered by the Federal Trade Commission or any official department, division, commission or agency of the state of New York.

Although § 350–c refers only to regulations administered by the Federal Trade Commission ("FTC"), the New York courts have construed that statute to cover regulations by other federal agencies as well.

*Mendelson v. Trans World Airlines, Inc.*, 120 Misc.2d 423, 466 N.Y.S.2d 168 (1983) (compliance with Civil Aeronautics Board regulations constitutes a complete defense under both §§ 349 and 350). Moreover, AHP's compliance with FDA labeling standards automatically puts it in compliance with FTC requirements as well, since the FTC has officially recognized that the FDA has primary jurisdiction over all matters relating to the labeling of OTC drugs. *See* 36 Fed.Reg. 18,539 (1971).

The Uniform Deceptive Trade Practices Act, which has been adopted by thirteen states, contains a comparable provision in section 4(a):

> This Act does not apply to (1) conduct in compliance with the orders or rules of, or a statute administered by, a federal, state, or local governmental agency.

The Uniform Trade Practices and Consumer Protection Law, which has been adopted by six other states, similarly provides in section 4:

> Nothing in this Act shall apply to:
>
> (1) Actions or transactions permitted under laws administered by the state public service commission or other regulatory body or officer acting under statutory authority of this State or the United States (or the state fair trade law).

At least six other states which have adopted neither of the two uniform codes have enacted consumer protection statutes containing exemptions similar to those provided in the model code.[2]

The rationale underlying the exemptive provisions of all of these statutes is the need for uniformity in the regulation of advertising and labeling and a deference to the expertise of the responsible regulatory agency.

Here the FDA expressly found that there was a need for uniformity in RS warnings on the labels of aspirin-containing products and expressly preempted all conflicting regulations. McNeil's counsel, David F. Dobbins, one of the country's leading attor-

**2.** *See* Ind.Code § 24–5–0.5–6(1) (1982); Mich. Stat.Ann § 19.418(4)(1)(a) (1981); S.D.Cod. Laws § 37–24–10 (1986); Tenn.Code Ann. § 47– 18–111(a)(1) (1984); Va.Code § 59.1–199(A) (1987); Wyo.Stat. § 40–12–110(a)(i) (1977).

neys in the field, has vigorously contended that the FDA's expert determinations as to the sufficiency of warnings on OTC drug labels should not be second-guessed by lay juries. In an article entitled *Labeling, FDA Requirements and Restrictions v. Duty to Warn* appearing in the Practicing Law Institute Monograph, *Food and Drug Compliance,* Mr. Dobbins stated at pages 52–53:

> Where the FDA has explicitly endorsed the particular facet of the labeling which is claimed to be inadequate, there is presented a clear conflict between federal law pertaining to the marketing of drugs in interstate commerce as directed by the FDA and the local law as applied by the particular lay jury. Federal regulation of drug safety and efficacy is pervasive and complete.

If FDA approval of the precise label used by a drug manufacturer is a defense to a consumer's product liability action, it should be, *a fortiori,* a defense to a competitor's action under the Lanham Act.

McNeil urges that in a Lanham Act suit, the competitor acts as a " 'vicarious avenger' of the public's right to be protected against false advertising," quoting from *John Wright, Inc. v. Casper Corp.,* 419 F.Supp. 292, 324–25 n. 18 (E.D.Pa.1976), rev'd on other grounds, 587 F.2d 602 (3d Cir.1978). But McNeil is not suing here merely to vindicate the public interest in drug labeling which gives adequate warning of possible side effects. It could do that by seeking only injunctive relief. However, it asks in addition for a massive money judgment to replace the profits it allegedly lost as a consequence of AHP's failure to warn of the danger of RS involved in the use of Anacin. While the consuming public would obviously benefit from an injunction requiring AHP to remedy any deficiency in its RS label warning, there is a serious question whether McNeil, which joined in the industry's opposition to a mandatory RS warning, would be entitled to such equitable relief.

In any event, the public interest is presumed to be adequately represented by the FDA, whose control over OTC drug labeling is, in the words of McNeil's own counsel, "pervasive and complete." If the intercession of a private attorney general is needed to press the FDA to perform that duty with respect to a particular product label, the quickest and most effective relief could be obtained through a direct petition to the agency and not through an unfair competition action against the manufacturer. As Judge Stewart observed in *American Home Products Corp. v. Johnson & Johnson,* 436 F.Supp. 785, 797 (S.D.N.Y. 1977), *aff'd,* 577 F.2d 160 (2d Cir.1978):

> [A]n action under the Lanham Act and state unfair competition laws is not the proper legal vehicle in which to vindicate the public's interest in health and safety.

McNeil lays great stress upon the fact that it does not complain merely about non-disclosure—the failure to include an adequate RS warning on the Anacin label—but about affirmative misrepresentation—the overall message of safety conveyed by the label.

It is true that the RS warning is buried in the fine print on the back of the Anacin package, while the front bears in large block letters the legend "SAFE, FAST PAIN RELIEF." This obviously creates the possibility that Anacin could be administered to a child or teenager with flu or chicken pox by a parent who perceived only a message of safety without being alerted to the danger, or taken by such a youngster on his or her own initiative without any suspicion of hazard. The consequences of such a mistake may be serious or even fatal. But this is a problem to be addressed by the FDA and not by the courts in a Lanham Act suit. Indeed, it is a problem which the FDA has already addressed, when it specifically approved the Anacin label in its entirety. There is no apparent reason why McNeil cannot ask the FDA to reconsider that approval in light of the survey evidence it has presented here to show the message users take from the Anacin package.

With the advantage of hindsight, it is now easy to see that the FDA's requirement of an RS warning on the labels of salicylate-containing OTC internal analge-

sics was far too long delayed—that the state epidemiological studies indicating a causal connection between salicylate ingestion and RS, whether methodologically flawed or not, were dead right.[3] It also seems clear that the aspirin manufacturers' opposition to an RS label warning was at least strongly influenced if not wholly motivated by self-interest. Their opposition appears not unlike that of the cigarette manufacturers, who disputed for years and still do not concede the reliability of studies indicating a causal relationship between cigarette smoking and lung cancer. Undoubtedly the delay in requiring an RS label warning resulted in unnecessary serious illness and even death of a number of children. It is not a pretty chapter in commercial history.

But in the early 1980s the FDA had to make decisions on the basis of the information then available to it. It had to consider not only possible hazards to the public health, but also the interest of the aspirin manufacturers, of medical professionals and of the public in freedom from groundless alarm about a highly useful OTC medication.

That it is now clear that the FDA was too deliberate about requiring an RS label warning is no reason for this Court to doubt their competence or their commitment to police OTC drug labeling and to mandate whatever additional changes need to be made in the Anacin label to minimize the RS hazard, and even less reason for this Court to vouchsafe that expert regulatory function to a lay jury.

AHP's motion to dismiss McNeil's ninth counterclaim is therefore granted. However, the Court cannot abstain from comment about a startling fact disclosed in an affidavit filed by McNeil in opposition to the motion: that there are still on the shelves of many retail stores pre–1985 packages of Anacin which do not bear either the RS warning mandated in 1986 or even the vaguer "consult a doctor" notice

---

3. On April 10, 1987, the report of the FDA-sponsored main study was published in the Journal of the American Medical Association. It concluded that there was "not only a strong association between Reye's Syndrome and salicylates

voluntarily adopted in 1985. This is unthinkable. All pre–1986 packages should be recalled *immediately*. If AHP does not do so voluntarily and promptly submit to the Court and McNeil evidence thereof, McNeil may move for reinstatement of the ninth counterclaim *nunc pro tunc*. AHP should obviously not be permitted to shield itself behind an FDA order with which it has not made every reasonable effort to comply in spirit as well as in letter.

SO ORDERED.

(and specifically aspirin), but also that a large proportion (90%, assuming an odds ratio of 40) of Reye's Syndrome cases may be attributable to salicylates."