POM WONDERFUL LLC, Plaintiff,

v.

The COCA COLA COMPANY,
Defendant.

No. CV 08–06237 SJO (FMOx).

United States District Court,
C.D. California.

May 5, 2010.

Allen J. Ruby, Allen Ruby Law Offices, San Jose, CA, Andrew Eric Asch, Christopher Van Gundy, Daniel A. Beck, Roll International Corporation, Andrew Steven Clare, Daniel Scott Silverman, David Aaron Grossman, Mark D. Campbell, Walter Allan Edmiston, Kristina M. Diaz, Loeb and Loeb, Los Angeles, CA, for Plaintiff.

Cynthia L. Sands, Kenneth M. Jones, Nelson L. Atkins, Gonzalez Saggio & Harlan LLP, Los Angeles, CA, Ryan Sirianni, Sarah E. Zgliniec, Steven A. Zalesin, Travis J. Tu, Yiling Chen–Josephson, Vivian Storm, Patterson Belknap Webb & Tyler LLP, New York, NY, Shani Thome, The Coca-Cola Company, Atlanta, GA, for Defendant.

**ORDER GRANTING IN PART, DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT PURSUANT TO FED. R. CIV. P. 56; DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY ADJUDICATION RE: DEFENDANT'S AFFIRMATIVE DEFENSES OF SAFE HARBOR AND COMPLIANCE WITH LAWS**
[Docket Nos. 149, 150]

S. JAMES OTERO, District Judge.

This matter is before the Court on Defendant The Coca Cola Company's ("Coca Cola" or "Defendant") Motion for Summary Judgment Pursuant to Fed.R.Civ.P. 56, filed December 28, 2009, and Plaintiff Pom Wonderful LLC's ("Pom" or "Plaintiff") Motion for Partial Summary Adjudication Re: Defendant's Affirmative Defenses of Safe Harbor and Compliance with Laws, also filed December 28, 2009. The parties filed Oppositions and Replies to the respective Motions. The Court found this matter suitable for disposition without oral argument and vacated the hearings set for January 25, 2010. *See* Fed.R.Civ.P. 78(b). For the following reasons, Coca Cola's Motion is **GRANTED IN PART** and **DENIED IN PART,** and Pom's Motion is **DENIED.**

## I. *BACKGROUND*

Pom produces, markets, and sells POM WONDERFUL® brand bottled pomegranate juice and various pomegranate juice blends, including a pomegranate blueberry juice blend. (First Am. Compl. ("FAC") ¶ 11; Pl.'s Statement of Genuine Issues of Fact and Proposed Conclusions of Law in Opp'n to Def.'s Mot. for Summ. J. ("Pl.'s SOF Opp'n") ¶ 1.) Coca Cola, under the brand Minute Maid, is one of Pom's primary competitors in the bottled pomegranate juice market. (FAC ¶ 17; Pl.'s SOF Opp'n ¶ 2.) In September 2007, Coca Cola announced a new product in its "Minute Maid Enhanced Juices" line, entitled "Minute Maid® Enhanced Pomegranate Blueberry Flavored 100% Juice Blend." (FAC ¶ 18; Pl.'s SOF Opp'n ¶ 3.) The formal name of "Minute Maid® Enhanced Pomegranate Blueberry Flavored 100% Juice Blend" is "Pomegranate Blueberry Flavored Blend Of 5 Juices" ("the Juice"). (Def.'s Mot. for Summ. J. Pursuant to Fed.R.Civ.P. 56 ("Def.'s Mot.") 3; Pl.'s SOF Opp'n ¶ 3; Decl. of Charles Torrey in Supp. of Def.'s Mot. for Summ. J. ("Torrey Decl.") ¶ 3.) Specifically, in ranking the ingredients of the Juice by volume, apple ranks first, grape ranks second, pomegranate ranks third, blueberry ranks fourth, and raspberry ranks fifth. (FAC ¶ 22.)

### A. *The Juice's Bottle*

"The Juice has used the same bottle and label since it was first introduced." (Pl.'s SOF Opp'n ¶ 8.) A "prominent banner or 'flag' (the "Banner") on the Juice label

states 'Omega–3/D HA HELP NOURISH YOUR BRAIN 5 Nutrients To Support Brain & Body.'" (Pl.'s SOF Opp'n ¶ 9.) Pom acknowledges that the Banner is prominent, but contends that "the text 'Omega–3/DHA' and '5 Nutrients To Support Brain & Body' is not prominently displayed." (Torrey Decl. Ex. 1, p. 9.) Above the Banner reads "100% Fruit Juice Blend," and below the Banner appears a fruit vignette (the "Fruit Vignette") that "depicts each of the five fruit ingredients in the Juice." (Torrey Decl. Ex. 1, p. 9; Pl.'s SOF Opp'n ¶¶ 10, 11.) Specifically, the Fruit Vignette includes images of a half-cut pomegranate, a half-cut apple, and several blueberries, grapes, and raspberries. (Torrey Decl. Ex. 1, p. 9.) Below the Fruit Vignette reads "Pomegranate Blueberry," and below that, "Flavored Blend Of 5 Juices." (Torrey Decl. Ex. 1, p. 9.) "The back of the Juice bottle reads 'Minute Maid Enhanced Pomegranate Blueberry Is Made With A Blend Of Apple, Grape, Pomegranate, Blueberry, And Raspberry Juices From Concentrate And Other Ingredients.'" (Torrey Decl. Ex. 1, p. 9.) It is undisputed that "[t]he back of the bottle does not include other references to pomegranates or blueberries." (Pl.'s SOF Opp'n ¶ 16.)

## B. The Juice's Advertisements

Coca Cola advertises the Juice "through television and print ad[vertisements], coupons, in-store promotions, and on the Minute Maid website." (Pl.'s SOF Opp'n ¶ 17.) Coca Cola maintains that its "brain-nour-ishment" claims, which form the centerpiece of the Juice's advertising and marketing campaign, "are based upon the unique combination of added nutrients, including not only Omega–3/DHA, but also choline, vitamin B–12, vitamin E, and vitamin C, all of which have been shown to contribute to brain development." [1] (Def.'s Mot. 3.) Coca Cola, therefore, contends that its "help nourish your brain" claim is fully substantiated, and that in fact, the National Advertising Division of the Council of Better Business Bureaus ("NAD") concluded that "[Coca Cola] ha[s] a reasonable basis for its claim that [the Juice] can 'help nourish your brain.'" (Def.'s Mot. 3; Decl. of Steven A. Zalesin in Supp. of Def.'s Mot. for Summ. J. ("Zalesin Decl.") Ex. 2.) "Pom does not contest the scientific accuracy of this claim." (Def.'s Mot. 3.) As such, Coca Cola argues that its advertising and marketing, separate and apart from the naming and labeling of the Juice, focus on the Juice's added nutrients and "brain nourishment," not on the Juice's pomegranate or blueberry content. (Def.'s Mot. 3.) Coca Cola further notes that its "[o]ther ads similarly emphasize that the Juice tastes great." (Def.'s Mot. 3.)

### 1. Coupons

Coca Cola contends that its "coupons have included pictures of the Juice bottle, but have focused on savings, rather than the fruit ingredients in the product," and that "in-store promotional materials describe the Juice as a 'Pomegranate Blueberry Flavored 100% Juice Blend' or 'Po-

---

1. The Court notes the Food and Drug Administration's ("FDA") February 23, 2010 Warning Letter to Pom. *See* Letter from Roberta C. Wagner, to Matt Tauper (Feb. 23, 2010) (on file with the Court) ("Your POM Wonderful 100% Pomegranate Juice and POMx products are offered for conditions that are not amenable to self-diagnosis and treatment by individuals who are not medical practitioners ... Thus, your products are misbranded under Section 502(f)(1) of the Act, in that the labeling for these drugs fails to bear adequate directions for use [21 U.S.C. § 352(f)(1) ] ... Your [product] is also a misbranded food within the meaning of Section 403(r)(1)(A) of the Act [21 U.S.C. § 343(r)(1)(A) ] because the product bears a nutrient content claim that does not meet the requirements to make the claim.").

megranate Blueberry Flavored Blend Of 5 Juices,' and [have] pictured the bottle sometimes next to its fruit ingredients—but have made no other references to pomegranates or blueberries." (Pl.'s SOF Opp'n ¶¶ 18, 20; Torrey Decl. Exs. 2, 3.) Pom, on the other hand, alleges that Coca Cola's "coupons prominently feature, in large text, the name 'POMEGRANATE BLUEBERRY,'" and that "[t]he promotional materials further display images of pomegranates only—and no other fruit—which are heaped about the bottle." (Pl.'s SOF Opp'n ¶¶ 18, 20; Pl.'s Statement of Additional Material Facts ("Pl.'s Addt'l SOF") ¶¶ 39–40; Torrey Decl. Exs. 2, 3.)

### 2. Print Advertisements

Coca Cola's print advertising has included campaigns entitled 'Love it or it's free!,' 'Helps nourish your brain and your sense of taste,' 'help nourish your brain,' 'OOPS Someone forgot to boost,' and 'You [2].' (Torrey Decl. Ex. 4; Pl.'s SOF Opp'n ¶¶ 22–23.) Coca Cola argues that these "print advertisements all featur[ed] pictures of the [Juice] bottle with few other references to pomegranates." (Pl.'s SOF Opp'n ¶ 22.) Coca Cola states that "[the Juice's] print ads [have] focused on the nutritional benefits of the Omega–3D/DHA fortification and the product's great taste rather than the Juice's pomegranate juice content." (Pl.'s SOF Opp'n ¶ 24.)

Pom disputes whether the focus of Coca Cola's print advertisements is solely on the nutritional benefits of the Omega–3/DHA fortification, and the Juice's good taste, and not on the Juice's pomegranate juice content. (Pl.'s SOF Opp'n ¶¶ 22, 24; Torrey Decl. Ex. 4.) Pom argues that Coca Cola's print advertisements prominently display the words "Blueberry Pomegranate." (Pl.'s SOF Opp'n ¶¶ 24, 25, 26.) Pom cites Coca Cola's print advertisements, which include "Minute Maid Pomegranate Blueberry flavored juice blend packs goodness for your brain and body in

every sip" as illustrative of Coca Cola's emphasis on the Juice's pomegranate blueberry content. (Pl.'s SOF Opp'n ¶ 24.) Furthermore, Pom cites one print advertisement that depicts only the top half of the Juice's bottle, thereby excluding "Pomegranate Blueberry Flavored Blend Of 5 Juices." (Torrey Decl. Ex. 4, p. 36.)

### 3. Television Advertisements

Coca Cola maintains that the television advertisements used to promote the Juice have "flashed images of the five fruit ingredients, but have made no other references to pomegranates or blueberries." (Pl.'s SOF Opp'n ¶ 29.) "For example, [Coca Cola cites] the 'We Meet Again' commercial, [that] focused on a man who mistook his daughter's art teacher for an ex-girlfriend before drinking the Juice, but correctly identified her afterwards." (Pl.'s SOF Opp'n ¶ 30.) Coca Cola argues:

> The commercial showed the man drinking from the bottle, displayed the bottle and its 'Help Nourish Your Brain' flag on its own, and flashed the Juice's five fruit ingredients ... An announcer described the Juice as 'Minute Maid Enhanced with a five-nutrient boost,' but made no mention of pomegranates or blueberries.

(Pl.'s SOF Opp'n ¶ 31.)

Pom, on the other hand, contends that Coca Cola's television advertising identifies the Juice as a "pomegranate and blueberry juice blend," first, and makes no explicit reference to the Juice's flavor. (Pl.'s SOF Opp'n ¶ 29; Pl.'s Addt'l SOF ¶¶ 41, 42.) Pom further alleges that the paper copy that Coca Cola submitted as evidence of the "Help Nourish Your Brain" commercial "does not depict the Juice's five fruit ingredients." (Pl.'s SOF Opp'n ¶ 31.)

### 4. The Minute Maid Website

Finally, Coca Cola maintains that its "Minute Maid website [the "Enhanced

Juices Website"] contains information about the Juice."[2] (Torrey Decl. Ex. 6; Pl.'s SOF Opp'n ¶ 33.) Coca Cola states that "[r]eferences to the Juice are on [the Enhanced Juices Website], and [also] in a section of the website dedicated to the Juice [the Juice Webpage]" (collectively, the "Minute Maid Webpages"). (Pl.'s SOF Opp'n ¶ 34.) Pom disputes whether the Enhanced Juices Website includes "sections," as Coca Cola contends, but otherwise agrees that the Minute Maid Webpages focus on the Juice's "product and nutrition information, storage tips, the benefits of the Juice's added ingredients, and games related to the Juice."[3] (Pl.'s SOF Opp'n ¶ 35.) Regardless of whether the relevant webpages form the same website, there are two distinct pages, one that relates to the Minute Maid® Enhanced Juices & Juice Drinks, generally, and which will be referred to as the Enhanced Juices Website, and one that relates to the Juice, specifically, and which will be referred to as the Juice Webpage. (Torrey Decl. 6.)

Coca Cola contends that "[h]eadings on [Minute Maid Webpages] refer to the Juice as 'Minute Maid® Enhanced Pomegranate Blueberry Flavored 100% Juice Blend,'" but which Pom contests.[4] (Pl.'s SOF Opp'n ¶ 36.) Instead, Pom argues that the "Flavored 100% Juice Blend" is in "a different text and font color, ... [and] far smaller than the header [Minute Maid® Enhanced Pomegranate Blueberry]." (Pl.'s SOF Opp'n ¶ 36; Torrey Decl. Ex. 6, p. 47.) Because "Flavored 100% Juice Blend" is also located on a lower line, Pom argues that the header consists of only "Minute Maid® Enhanced Pomegranate Blueberry." (Pl.'s SOF Opp'n ¶ 36; Torrey Decl. Ex. 6, p. 47.)

The parties disagree over other features of the Juice Webpage, too. Coca Cola asserts that the Juice Webpage sufficiently emphasizes " 'Minute Maid® Enhanced Pomegranate Blueberry Flavored 100% Juice Blend,' " and places "no emphasis on pomegranates or pomegranate juice, let alone on the specific health benefits (e.g., reduced risk of cancer) that Pom claims [Coca Cola] provide[s]." (Pl.'s SOF Opp'n ¶ 40; Torrey Decl. Ex. 6, p. 47.) The Juice Webpage contains the following language:

Minute Maid® Enhanced Pomegranate Blueberry is a great tasting flavored 100% juice blend with 50mg of Omega–3/DHA per 8 fl. oz. serving and four other nutrients to help nourish your

2. The Court notes that the parties refer to www.minutemaid.com in their pleadings, but when the Court attempted to access said website, it was directed to www.minutemaid.com/index.jsp. (Pl.'s SOF Opp'n ¶ 33.) Furthermore, because the parties identify said website as including references to the Juice, as well as depicting the full Minute Maid® Enhanced Juice and Juice Drink line, it is assumed that the parties intend to refer to www.minutemaid.com/EnhancedJuices.jsp, which includes those features. Accordingly, the Court will refer to www.minutemaid.com/EnhancedJuices.jsp as the Enhanced Juices Website because it most closely parallels that which the parties refer to in their pleadings. To that end, the Enhanced Juices Website provides access to the "Minute Maid® Enhanced Pomegranate Blueberry" page, www.minutemaid.com/PomegranateBlueberry.jsp, which includes even more information about the Juice, and will be referred to as the "Juice Webpage."

3. The Enhanced Juices Website includes a row of different words, each of which provides information relating to a different topic. The row includes the following "topics:" (1) Products; (2) Healthy Living; (3) Recipes; (4) About Us; (5) Promotions; (6) News; and (7) Downloads.

4. Here, it is clear that Coca Cola intends to cite to what the Court refers to as the Juice Webpage, since the Enhanced Juices Website does not include any heading that reads "Minute Maid® Enhanced Pomegranate Blueberry Flavored 100% Juice Blend."

brain and body. Find it in the chilled juice section of your local store.

(Torrey Decl. Ex. 6, p. 47.) Below this language is an icon entitled "get product information," that links to another page (the "Get Information Page") that includes additional information about the Juice:

> Minute Maid Enhanced Pomegranate Blueberry is a great tasting flavored 100% juice blend with 50mg of Omega–3/DHA per 8 fl. oz. serving and four other nutrients to help nourish your brain and body. By combining natural fruit juices and targeted fortification, this new Minute Maid Enhanced Juice delivers enhanced nutrition, and is a perfect addition to a healthy diet.

(Torrey Decl. Ex. 6, p. 48.) Still more, an icon entitled "Nutrition Information" on the Get Information Page, links to another page that contains the Juice's nutritional information (the "Nutritional Information Page"). (Torrey Decl. Ex. 6, p. 50.) The Nutritional Information Page states that the Juice contains apple, grape, and pomegranate juices from concentrate, blueberry juice from concentrate, natural flavors, and raspberry juice from concentrate. (Torrey Decl. Ex. 6, p. 50.)

Consequently, Pom contends that the Minute Maid Webpages emphasize the Juice's pomegranate and blueberry juice content. (Pl.'s SOF Opp'n ¶¶ 36–40.) Pom notes that Minute Maid's Brand Director, Ashley Ann Schmidt, confirmed that the Minute Maid Webpages are intended to advertise and market the Juice.[5] (Pl.'s Addt'l SOF ¶ 5.)

### C. Pom's Allegations Against Coca Cola

"[T]he main ingredients in [the Juice] are neither pomegranate, nor blueberry juice, but rather, apple and grape juice." (FAC ¶ 19; supra Part I.) Specifically, the Juice "contains only 0.3% pomegranate juice and 0.2% blueberry juice." (Pl.'s Addt'l SOF ¶ 1; Silverman Decl. Ex. F.) By contrast, "[a]pple and grape juices make up more than 99.4% of the Juice's contents, with the fifth type of juice, raspberry juice, making up just 0.1%." (Pl.'s Addt'l SOF ¶ 1; Silverman Decl. Ex. F.) Therefore, Pom contends that Coca Cola labels the Juice as a "Pomegranate Blueberry" juice, and advertises and markets it, through its packaging, commercials, Minute Maid Webpages,[6] and other forms of advertising, "based on the representation that the Juice's primary ingredients ... are pomegranate and blueberry juice, when, in fact, the primary ingredients are actually apple and grape juice." (FAC ¶¶ 8, 20.) Accordingly, Pom alleges that consumers of the Juice "are likely to be misled and deceived by [its] ... labeling, marketing and advertising," which damages not only the consuming public, but also Pom, as Coca Cola's competitor. (FAC ¶¶ 23–26.)

#### 1. Consumer Complaints

Pom contends that Coca Cola has received a record number of complaints regarding the Juice. (Pl.'s Addt'l SOF ¶¶ 16–23; see generally Nancy Tyndal Dep. 11–15, 43–49, 252, Dec. 10, 2009.) Nancy Tyndal ("Tyndal"), a fourteen-year employee of Coca Cola, and who has "field[ed] consumer complaints about many

---

5. The Court notes that Ms. Schmidt used the language "the Website," which is terminology that the Court has since abandoned because it is an overly broad definition of the Minute Maid Webpages. It is, however, irrelevant whether Ms. Schmidt intended to refer to the Enhanced Juices Website or the Juice Webpage. What is important is whether Minute Maid intends to use the Minute Maid Webpages as a form of communicating to consumers.

6. The Court again notes that the parties' references to "the Minute Maid website" encompasses both the Enhanced Juices Website and the Juice Webpage.

products, ... asserts that there have been no Minute Maid products about which consumers have complained more." (Nancy Tyndal Dep. 252:6–18, Dec. 10, 2009.) Indeed, Pom provides a list of consumer complaints provided to it by Coca Cola, and which Pom contends suggests that consumers have been misled into believing that the Juice was something for which it is not. (Pl.'s Addt'l SOF ¶¶ 19–23.) For example, one consumer complaint reads:

> Today I made the mistake of buying [the] Minute Maid product that you call 'Pomegranate Blueberry[.]' What a crock. It's nothing but fancy apple grape juice. You people are scumbags for mislabeling your products. I'll never buy this product again. I'll never buy Minute Maid products again. And I'll tell all of my friends about this fraud. Thanks for wasting my time and money .... [7]

(Pl.'s Addt'l SOF ¶ 19; Pl.'s Opp'n 3–4.) The Court notes that Pom has referenced several other similar complaints, but con-cludes that it unnecessary to reference them all. (Pl.'s Opp'n 4.)

### 2. The Field Survey

"Pom commissioned Dr. E. Deborah Jay ("Dr. Jay") to conduct a survey (the "Field Survey") that assesse[d] consumer confusion in connection with [Coca Cola's] advertising of the Juice." [8] (Pl.'s SOF Opp'n ¶ 43; Pl.'s Addt'l SOF ¶¶ 24–33.) Dr. Jay concluded that "a substantial proportion of potential purchasers of pomegranate and blueberry juice blends are likely to mistakenly believe that [the Juice] mainly contains pomegranate and blueberry juice (and not other types of fruit juice) due to the packaging (the words 'pomegranate blueberry' on the front of the bottle and in the product name on the back of the bottle)." (Pl.'s SOF Opp'n ¶ 47.) Pom notes that "Dr. Jay did not purport to conclude that this was the only consumer confusion which exists regarding the Juice, or that such confusion is limited to the bottle, as opposed to other means of false advertis-

---

7. The Court notes Coca Cola's opposition to Pom's inclusion of "selected consumer complaints." (*See generally* Def.'s Objections to Evidence Presented in Conjunction with Pl.'s Opp'n to Summ. J. ("Def.'s Objections to Evidence")) Pom, however, alleges that the complaints it cites and relies upon, were produced by Coca Cola. (Silverman Decl. ¶¶ 15–19.) In any event, even if the Court declines to address the consumer complaints to which Coca Cola objects, Nancy Tyndal, a Coca Cola employee, states that in her experience, the Juice has received more complaints than any other Minute Maid product. (Silverman Decl. Ex. L.)

8. Dr. Jay is the President and CEO of Field Research Corporation, which is, according to Pom, one of the oldest and most respected marketing and public opinion research firms in the United States. (Pl.'s Addt'l SOF ¶ 24.) The Field Survey was conducted with 538 face-to-face double-blind interviews of adults age 18 and older who believed they would purchase a pomegranate juice blend and a blueberry juice blend in the next three months. (Pl.'s Addt'l SOF ¶ 25.) "The Field Survey interviewed a 'test' group of respondents who were shown the Juice's actual bottle label, along with a 'control' group of respondents who were shown a slightly modified bottle with the words 'Pomegranate Blueberry' removed from the front and back label." (Pl.'s Addt'l SOF ¶ 26.) According to Pom, "36% of the test group in the Field Survey indicated that they believed the Juice mainly contains pomegranate and blueberry juice, and not other types of fruit juice." (Pl.'s Addt'l SOF ¶ 27.) "32% of the test group in the Field Survey indicated that they believed the Juice mainly contains pomegranate and blueberry juice, and not other types of fruit juice, *because of the words* 'pomegranate blueberry' on the label." (Pl.'s Addt'l SOF ¶ 28) (emphasis added.) Finally, Pom contends that "1% of the control group in the Field Survey indicated that they believed the Juice mainly contains pomegranate and blueberry juice, and *not other types of fruit juice.*" (Pl.'s Addt'l SOF ¶ 29) (emphasis added.)

ing." (Pl.'s SOF Opp'n ¶ 47.) Pom further contends that "[t]he 35% differential which the Field Survey found between the test and control groups' respective belief that the Juice only contains pomegranate and blueberry juice far exceeds the percentage that district courts typically find acceptable for a consumer survey in support of a Lanham Act claim." (Pl.'s Opp'n 5.) Therefore, Pom argues that the Field Survey demonstrates the misleading effect that the Minute Maid Webpages have on consumers, so that consumers are likely "to believe that the Juice *mainly* contains pomegranate and blueberry juice (and not other types of fruit juice)." (Pl.'s Addt'l SOF ¶¶ 32–33.) Accordingly, Pom claims that "[t]he Field Survey evidences the misleading effect of [Coca Cola's] decision to identify the Juice by the name 'Pomegranate Blueberry.'" (Pl.'s Addt'l SOF ¶ 31.)

Principally, Coca Cola contests the efficacy of the Field Survey. (Pl.'s SOF Opp'n ¶¶ 43–47.) First, Coca Cola argues that "[t]he only stimulus shown to the survey participants was the bottle and the label of the Juice," and so, the Field Survey did "not attempt to evaluate the messages conveyed by Minute Maid's website or any of [Coca Cola's] other advertising." (Pl.'s SOF Opp'n ¶ 45; Def.'s Mot. 3–4.) Coca Cola notes that "[t]he [Field] [S]urvey found that the main message the [Juice's] bottle communicated to most consumers was that 'the product is healthy, nutritious, nourishes the brain, is good for you, has Omega–3/DHA or has other vitamins and nutrients.'" (Pl.'s SOF Opp'n ¶ 46.) Finally, Coca Cola alleges that "Dr. Jay concluded that any consumer confusion about the [Juice] was due to packaging (the words 'pomegranate blueberry' on the front of the bottle and in the product

name on the back of the bottle)," and not due to the Juice's advertising or marketing. (Pl.'s SOF Opp'n ¶ 47.)

### 3. Coca Cola's Alleged Knowledge That the Juice Is Misleading

Finally, Pom argues that Coca Cola knew that the Juice was misleading, but willingly assumed the advertising risk that any misconception necessarily created. (Pl.'s Opp'n to Def.'s Mot. for Summ. J. ("Pl.'s Opp'n") 3.) Pom cites a correspondence between Coca Cola employees sent prior to the Juice's launch, and which allegedly illustrates Coca Cola's intent to launch a misleading product: [9]

> As discussed here is a copy of the front label for the new MM Enhanced Juice Pomegrante [sic] Blueberry product. The product has a blend of apple, grape, pomegranate, blueberry & raspberry juices from conc. We are in compliance with the FDA regs related to the naming of juice containing products. There is a risk from a misleading standpoint as the product has less than 0.5% of pomegranate and blueberry juices. Mike St. John is aware of this issue & is willing to assume the risk.

(Silverman Decl. Ex. H; Pl.'s Opp'n 3; Pl.'s Addt'l SOF ¶¶ 6–7.) According to Pom, "[t]his e-mail constitutes damning evidence of [Coca Cola's] willful consumer deception." (Pl.'s Opp'n 3.)

### D. Procedural History

Based on the above-mentioned facts, Pom brought suit against Coca Cola on September 22, 2008, alleging causes of action for: (1) false advertising under the Lanham Act, 15 U.S.C. § 1125(a); (2) false advertising under California Business and Professions Code § 17500; and (3) statutory unfair competition under California

---

9. The correspondence at issue here was sent by A. Lucy Reid ("Reid"), Coca Cola's Director of Scientific and Regulatory Affairs, to Reid's boss, Mike St. John ("St. John"), President and General Manager of Minute Maid. (Pl.'s Opp'n 3; Pl.'s Addt'l SOF ¶¶ 6–7; Silverman Decl. Exs. G, H.)

Business and Professions Code § 17200. (*See* FAC ¶¶ 28–50.) On February 10, 2009, the Court denied in part, and granted in part, Coca Cola's Motion to Dismiss (the "First Motion to Dismiss"). (*See* Order of Feb. 10, 2009.) Specifically, the Court granted in part Coca Cola's First Motion to Dismiss Pom's Lanham Act claim "only to the extent it challenges the Juice's formal name and labeling in areas for which the FDA has promulgated regulations implementing the [Federal Food, Drug, and Cosmetic Act]." [10] (*See* Order of Feb. 10, 2009.) Regarding Pom's state law claims, the Court granted in part Coca Cola's First Motion to Dismiss "to the extent [the state law claims] seek to impose any obligations that are 'not identical to' the sections of the FFDCA ...." (*See* Order of Feb. 10, 2009.) The Court concluded:

> [t]o the extent the safe harbor doctrine applied in this case, it would only bar Pom's claim for statutory unfair competition under California Business and Professions Code § 17200 with respect to "business practices specifically permitted" or conduct "clearly permit[ted]" by the FFDCA .... [However,] [b]ecause Coca Cola merely contends that the safe harbor doctrine applies to the 'FDA's Juice naming regulations' and the Court has already held that Pom's state law claims are expressly preempted to the extent they seek to impose obligations differing from those contained in the FFDCA and its accompanying FDA regulations regarding the

Juice's "common or usual name," the safe harbor would not extend beyond the portion of the claims that the Court has already found to be expressly preempted by the FFDCA.

(*See* Order of Feb. 10, 2009.)

Following the filing of Pom's FAC on July 27, 2009, Coca Cola filed a Motion to Dismiss First Amended Complaint Pursuant to Fed.R.Civ.P. 12(b)(6) (the "Second Motion to Dismiss"). (*See generally* FAC.) The Court "reasserted its previous position" and denied Coca Cola's Second Motion to Dismiss. (*See* Order of Sept. 15, 2009, 2009 WL 6254619.) The Court concluded that "FDA juice-naming and labeling regulations do not bar Pom from alleging that Coca Cola has advertised or marketed the Juice in a misleading manner on its website and in other advertising avenues ... at this motion to dismiss stage it is unnecessary to demarcate and identify which (if any) of the allegations in the FAC are within the FDA's sole purview, and which allegations are encompassed by the Lanham Act." (*See* Order of Sept. 15, 2009.) Moreover, regarding Pom's state law claims, the Court permitted Pom to establish that Coca Cola's profits can be " 'traced to ill-gotten funds,' which would [therefore,] be a 'vested' interest, and entitle Pom to restitution." (*See* Order of Sept. 15, 2009.) However, without more facts before it, the Court declined to preclude Pom from pursuing its state law claims at the motion to dismiss stage.

**10.** The Federal Food, Drug, and Cosmetic Act ("FFDCA"), also referred to as the Federal Drug and Cosmetic Act ("FDCA"), gives the FDA authority to promulgate regulations that govern the branding of food, in order to "promote honesty and fair dealing in the interest of consumers." 21 U.S.C. §§ 301, 341. "Under 21 U.S.C. § 337(a), the FDCA provides that 'all such proceedings for the enforcement, or to restrain violations of [the Act] shall be by and in the name of the United States.' Courts have generally interpreted this to mean that no private right of action exists to redress alleged violations of the FDCA." *Summit Technology, Inc. v. High–Line Medical Instruments Co., Inc.,* 922 F.Supp. 299, 305 (C.D.Cal.1996) (internal citations omitted); *Ginochio v. Surgikos, Inc.,* 864 F.Supp. 948, 956 (N.D.Cal.1994) (citing various courts that have held that "there is no private cause of action for violations of the [FDCA]").

Coca Cola now moves for summary judgment, arguing that "Pom can point to no evidence that [Coca Cola's] marketing or advertising for the Juice—as distinguished from [the Juice's] name and label—is false or misleading." (Def.'s Mot. 2) Pom, too, moves for partial summary adjudication, on the grounds that applicable law does not provide Coca Cola with the "safe harbor" or "compliance with laws" affirmative defenses to Pom's claims, and which are asserted pursuant to the Lanham Act § 43(a) ("the Lanham Act") and Cal. Bus. & Prof.Code §§ 17200 and 17500. (See Pl.'s Notice of Mot. and Mot. for Partial Summ. J. Re: Def.'s Affirmative Defenses of Safe Harbor and Compliance with Laws; Mem. of P. & A. ("Pl.'s Mot.") 2.)

## II. DISCUSSION

### A. Standard for Summary Judgment

Summary judgment is proper only if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact." Fed.R.Civ.P. 56(c). A "material" fact is one that could affect the outcome of the case under the governing substantive law, and an issue of material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non[-]moving party."

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); see Atlanta Attachment Co. v. Leggett & Platt, Inc., 516 F.3d 1361, 1365 (Fed.Cir.2008) (internal citation omitted).

In determining whether a genuine issue of material fact exists, the court must not make credibility determinations or weigh conflicting evidence. Anderson, 477 U.S. at 255, 106 S.Ct. 2505. Rather, the court must view the evidence in the light most favorable to the non-moving party, drawing all "justifiable inferences" in its favor. Id. (internal citation omitted); see Atlanta Attachment Co., 516 F.3d at 1365 (internal citation omitted); Group One, Ltd. v. Hallmark Cards, Inc., 254 F.3d 1041, 1045 (Fed.Cir.2001) (internal citations omitted).

### B. The Lanham Act

"Under the Lanham Act, any person that uses a 'false description or representation' that is 'in connection with any goods' is liable to another private individual 'who believes he is or is likely to be damaged by the use of any such false description or representation.'" Pom Wonderful LLC v. Ocean Spray Cranberries, Inc. ("Ocean Spray"), 642 F.Supp.2d 1112, 1117 (C.D.Cal.2009) [11]; see Jack Russell Terrier Network of Northern California v. American Kennel Club. Inc., 407 F.3d 1027, 1036 (9th Cir.2005); 15 U.S.C. § 1125(a).[12] Indeed, the Lanham Act is

---

**11.** "After filing the present action, Pom filed three other actions in the Central District of California, alleging that Tropicana Products ("Tropicana"), Ocean Spray Cranberries, Inc. ("Ocean Spray"), and Welch Foods, Inc. ("Welch's") misrepresent the amount of pomegranate juice ... contained in their blended juice products." (Pl.'s Opp'n 6.) The Court notes that although the three sister cases are similar to the present case, they are also factually distinguishable. For example, although Pom cites Ocean Spray, the Ocean Spray label arguably includes a greater number of references to pomegranate juice, including "If you're a cranberry or pomegranate lover this juice should make you 100% happy!" and

"We've combined two anti-oxidant powerhouses, the cranberry and pomegranate, along with other tasty juices." As such, in Ocean Spray, Judge Dean D. Pregerson concluded that he did not find that "the essential claim advanced by [the] [p]laintiff—that [the] [d]efendant's label misrepresents the primary ingredients of the Beverage—relies on a determination by the FDA or an interpretation of its regulations." Ocean Spray, 642 F.Supp.2d at 1119.

**12.** Section 43(a) of the Lanham Act as amended, states: (1) Any person who, on or in connection with any goods or services, or any container for goods, used in commerce

designed to protect commercial interests from a competitor's false advertising and to protect the business community from having its reputation and good will diverted. *See Phoenix v. McDonald's Corp.*, 489 F.3d 1156, 1168 (11th Cir.2007); *see also Schering–Plough Healthcare Products, Inc. v. Schwarz Pharma, Inc.*, 586 F.3d 500, 512 (7th Cir.2009) ("The purpose of the false-advertising provisions of the Lanham Act is to protect sellers from having their customers lured away from them by deceptive ads or labels, or other promotional materials."). To establish a false advertising claim under the Lanham Act, a plaintiff must demonstrate that the challenged description or representation is false. *Gonzalez v. Allstate Ins. Co.*, 2005 WL 5891935, *5 (C.D.Cal. Aug. 2, 2005).

"Falsity may be established by proving that (1) the advertising is literally false as a factual matter, or (2) although the advertisement is literally true, it is likely to deceive or confuse consumers." [13] *Lipton v. Nature Co.*, 71 F.3d 464, 474 (2d Cir. 1995); *see Southland Sod Farms*, 108 F.3d 1134, 1139 (9th Cir.1997) ("[t]o demonstrate falsity within the meaning of the Lanham Act, a plaintiff must show that an advertisement is literally false, ... or that the statement was literally true but likely to mislead or confuse consumers."); [14] *see Mutual Pharm. Co. v. Watson Pharm., Inc.* ("*Mut. Pharm. Co. II*"), 2009 WL 3401117 (C.D.Cal. Oct.19, 2009). "[T]he Lanham Act encompasses more than blatant falsehoods. It embraces 'innuendo, indirect intimations, and ambiguous sug-

any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—(A) is likely to cause confusion, or to cause mistake or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his goods, services, or commercial activities by another person, or (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act. 15 U.S.C. § 1125(a).

13. Some courts frame the requirements for establishing a false advertising claim under § 43(a) of the Lanham Act differently, requiring that plaintiffs show: (1) a false statement or fact by the defendant in a commercial advertisement about its own or another's product; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the defendant caused its false statement to enter interstate commerce; (5) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales

from itself to defendant or by a lessening of the good will associated with its products. *Del Webb Cmty., Inc. v. Partington*, 2009 WL 3053709 (D.Nev. Sept. 18, 2009) (citing *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1139 (9th Cir.1997)); *see CKE Rest. v. Jack In The Box, Inc.*, 494 F.Supp.2d 1139, 1143–1148 (C.D.Cal.2007). Either way, Pom must show that Coca Cola made false or misleading advertisements, and that Coca Cola's advertisements deceived a substantial segment of its audience. Thus, regardless of how the Court frames the test, the principal two requirements for establishing liability under § 43(a) of the Lanham Act remain the same.

14. "To constitute commercial advertising or promotion, a statement of fact must be: (1) commercial speech; (2) by the defendant who is in commercial competition with the plaintiff; (3) for the purpose of influencing consumers to buy defendant's goods or services. While the representations need not be made in a 'classic advertising campaign,' but may consist instead of more informal types of 'promotions,' the representations (4) must be disseminated sufficiently to the relevant purchasing public to constitute 'advertising' or 'promotion' within that industry." *Mut. Pharm. Co. II*, 2009 WL 3401117 at *3 (citing *Coastal Abstract Service, Inc. v. First American Title Ins. Co.*, 173 F.3d 725, 735 (9th Cir.1999)).

gestions' evidenced by the consuming public's misapprehension of the hard facts underlying an advertisement." *The Procter & Gamble Co. v. Chesebrough–Pond's Inc.,* 747 F.2d 114, 119 (2d Cir.1984) (internal citations omitted); *see Cytosport, Inc. v. Nature's Best, Inc.* (*"Cytosport"*), 2007 WL 1345379, *1 (E.D.Cal. May 8, 2007); *see Cottrell, Ltd. v. Biotrol Int'l, Inc.* (*"Cottrell"*), 191 F.3d 1248, 1252 (10th Cir. 1999); *see also Pfizer, Inc. v. Miles, Inc.,* 868 F.Supp. 437, 442 (D.Conn.1994) (holding that [the Lanham Act] embraces false impressions, innuendo, and ambiguous suggestions). Moreover, the Lanham Act covers only "commercial advertising or promotion." *Schwarz Pharma, Inc. v. Breckenridge Pharm., Inc.,* 388 F.Supp.2d 967, 981 (E.D.Wisconsin 2005) (citing *Sanderson v. Culligan Intern., Co.,* 415 F.3d 620, 624 (7th Cir.2005) and *First Health Group Corp. v. BCE Emergis Corp.,* 269 F.3d 800, 803 (7th Cir.2001)).

■ Finally, because "[t]he Lanham Act and the FFDCA have overlapping jurisdiction in areas such as marketing and product labeling, though the purposes of the two statutes are different," the Court now turns to an analysis of the FFDCA and FDA. *Ocean Spray,* 642 F.Supp.2d at 1118.

### 1. *The FFDCA and FDA* [15]

Compared to the Lanham Act, which is "primarily intended to protect commercial interests from unfair competition," the FFDCA, which was passed by Congress in response to "unsafe drugs and fraudulent marketing," is intended to "protect the public from unsafe or mislabeled products" by setting forth federal labeling requirements. *Wyeth v. Sun Pharm. Industries,*

*Ltd.,* 2010 WL 746394 (E.D.Mich. Mar.2, 2010) (citing *Wyeth v. Levine,* S.Ct. 1187, 1195 (2009)) [16]; *see* 21 C.F.R. §§ 101 *et seq.*; *see Schwarz Pharma, Inc.,* 388 F.Supp.2d at 973 ("The Lanham Act provides a remedy to a plaintiff harmed by 'commercial advertising or promotion' that 'misrepresents the nature, characteristic, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities . . . In contrast, the FDCA 'is not focused on the truth or falsity of the advertising claims' but on protecting the public interest in safety and efficacy of food, drugs, and cosmetics.") (internal citations omitted). Moreover, the FFDCA can only be enforced by the FDA or the Department of Justice. *Id.; Ocean Spray,* 642 F.Supp.2d at 1118 (internal citations omitted).

Indeed, the FFDCA is explicit: "all such proceedings for the enforcement, or to restrain violations, of this chapter shall be by and in the name of the United States." 21 U.S.C. § 337(a). "When and if a claim strays too close to the exclusive enforcement domain of the FDA, it cannot stand." *Schwarz Pharma, Inc.,* 388 F.Supp.2d at 973 (citing *Summit Tech., Inc.,* 922 F.Supp. at 306); *see Schering–Plough,* 586 F.3d at 508–09 (holding that the FDA should be given the chance to opine on the proper labeling before a Lanham Act suit is filed because it has more experience with consumers' understanding of drug labels than judges do); *see also United States v. An Article of Food . . . Manischewitz,* 377 F.Supp. 746, 749 (D.C.N.Y. 1974) ("The function of the court in [sic] merely to determine whether the existing label is misleading, not to tell the [FDA] what amendments may be appropriate in order to rectify the situation.)". [17]

---

**15.** *See supra* note 10.

**16.** The Court cites to the Supreme Court Reporter because this case has not yet been published by the U.S. Reporter.

**17.** "The FDCA renders unlawful, inter alia, the misbranding of food and the distribution of misbranded food, [21 U.S.C. § 343; 21 U.S.C. § 331(a)-(b) ], and it authorizes the FDA to enforce those prohibitions via enforcement actions in the United States District

In 1990, Congress passed the Nutrition Labeling and Education Act ("NLEA"), which promulgated rules for labeling and branding foods. *See* The Nutrition Labeling and Education Act of 1990, (Public Law 101–535).[18] Specifically, the NLEA addressed the issue of when consumers may be led to believe that a named juice is present in a beverage more than is actually the case.[19] *Id.* On July 2, 1991, in response to the passage of the NLEA, the FDA published for comment, proposed rules (the "1991 proposals") pertaining to the naming and labeling of multi-juice beverages. *See* Food Labeling; Declarations of Ingredients; Common or Usual Name for Nonstandardized Foods; Diluted Juice Beverages, 56 Fed. Reg. 30452–01 (proposed July 2, 1991) (to be codified at 21 C.F.R. §§ 101, 102).[20] The FDA expressly noted:

> [C]onsumers should be given enough accurate information to easily ascertain the nature of the juices represented to be present in a multiple-juice beverage. Many multiple-juice beverages, for example, contain only a small amount of a highly flavored, expensive juice ... Consequently, the agency is proposing to revise the current § 102.33(a) to state

that if a product contains less than 100 percent juice, and uses the word "juice" in the common or usual name, then the word "juice" must be qualified by a term that indicates dilution (e.g., drink, beverage, cocktail).

*Id.* at 30455, 30461. The FDA further suggested:

> [I]f a product is a multiple-juice beverage or blend of single-strength juices, and declares, names, implies, or represents on the label, other than in the ingredient statement, one or more of the individual juices (represented juices), then the names of the juices so listed shall be included in the common name or usual name in descending order of predominance by volume, unless the common or usual name specifically shows that the represented flavor is used as a flavor (e.g., raspberry-flavored apple and pear juice drink) ... Thus, FDA [proposes in 21 C.F.R. § 102.33(c) ] that if a diluted multiple-juice beverage or blend of a single-strength juice contains a represented juice and one or more that is not represented i.e., not named or implied through words or vignettes, other than in the ingredient statement, then the common or usual name for the prod-

---

Courts for injunctions or criminal penalties. *Id.* at §§ 332, 333. The FDCA also delegates to the FDA certain additional tools to prevent misbranding. The FDA may, and indeed must, officially express its concerns with a warning or label before reporting a violation to a United States Attorney for criminal proceedings, to afford the regulated entity notice and an opportunity to present its views. *Id.* at § 335. In the case of 'minor violations,' the agency may issue 'a suitable written notice or warning.' *Id.* at § 336. The FDA is also delegated the authority affirmatively to regulate food labels and warnings." *See Fellner v. Tri–Union Seafoods, L.L.C.,* 539 F.3d 237, 254–55 (3d Cir.2008).

**18.** The NLEA amended the FFDCA and sought to "address concerns that the FDA had brought 'virtually no enforcement actions'

against the types of claims it had previously prohibited by clarifying and strengthening 'the [FDA's] legal authority ... to establish the circumstances under which claims may be made about the nutrients in foods ...' " *Whitaker v. Thompson,* 239 F.Supp.2d 43, 45 (D.D.C.2003); *see* 21 C.F.R. §§ 343 *et seq.*

**19.** 21 U.S.C. § 343(a) provides that a food shall be deemed misbranded if "its labeling is false or misleading in any particular way." 21 U.S.C. § 343(a).

**20.** Regulations under 21 C.F.R. Part 101 provide general provisions for food labeling and provide detailed regulations relating to 21 U.S.C. § 343(f). *See* 21 C.F.R. § 101.30 (regulating "any food that purports to be a beverage that contains any fruit or vegetable juices.")

uct shall indicate that the non-represent-ed juices are present (e.g., "Raspcran-berry: raspberry and cranberry juice in a blend of two other fruit juices.") *Id.* at 30462. Thus, the 1991 proposals reflected the FDA's position that a multi-ple-juice beverage named for a represent-ed flavor would not necessarily be mislead-ing. *Id.*

Thereafter, on January 6, 1993, the FDA issued final rules in response to the NLEA (the "1993 Final Rules"). *See* Food Label-ing; Declarations of Ingredients; Common or Usual Name for Nonstandardized Foods; Diluted Juice Beverages, 58 Fed. Reg. 2897–01 (Jan. 6, 1993) (to be codified at 21 C.F.R. §§ 101, 102). Here, the FDA explained that if a named juice is not the predominant juice:

> The label must either state that the beverage is flavored by the named juice (e.g., "raspberry *flavored* juice drink") or declare that the content of the named juice in a 5 percent range (e.g. "raspber-ry juice drink 2 to 7 percent raspberry juice"). The agency believes that this approach will adequately deal with the kinds of misleading labeling discussed in the comments from consumer groups.

*Id.* at 2900 (emphasis added); *see* 21 C.F.R. § 102.33(b) (2009) ("If the product is a diluted multiple-juice beverage or a blend of single-strength juices and names, other than in the ingredient statement, more than one juice, then the names of those juices must be in descending order or predominance by volume *unless the name specifically shows that the juice with the represented flavor is used as a flavor* (e.g., raspberry-flavored apple and pear juice.") (emphasis added)).

Again, the 1993 Final Rules reflected the FDA's position that multiple-juice bev-erages named for a represented or charac-teristic flavor or juice are not necessarily misleading. 58 Fed. Reg. 2897 at 2918–19 ("The basic nature of a product can be described in various ways, e.g., as a blend of five juices," and a product containing apple, grape, raspberry, and cranberry juice may include the name "Raspberry and cranberry flavored juice beverage in a blend of two other juices … There are several ways in which a multiple-juice bev-erage can be appropriately labeled.").

Consequently, in accordance with the 1993 Final Rules, 21 C.F.R. § 102.33(c) states:

> If a diluted multiple-juice beverage … contains a juice that is named or implied on the label or labeling other than the ingredient statement (represented juice) and also contains a juice other than the named or implied juice (nonrepresented juice), then the common or usual name for the product shall indicate that the represented juice is not the only juice present (e.g., "Apple blend; apple juice in a blend of two other fruit juices").

*See* 21 C.F.R. § 102.33(c) (2009). Similar-ly, 21 C.F.R. § 102.33(d) provides:

> In a diluted multiple-juice beverage or blend of single-strength juices where one or more, but not all, of the juices are named on the label other than in the ingredient statement, and where the named juice is not the predominant juice, the common or usual name for the product shall: (1) *Indicate that the named juice is present as a flavor or flavoring* (e.g., "Raspcranberry"; rasp-berry and cranberry flavored juice drink); or (2) Include the amount of the named juice, declared in a 5–percent range (e.g. Raspcranberry; raspberry and cranberry juice beverage, 10– to 15–percent cranberry juice and 3– to 8–percent raspberry juice.) The 5–per-cent range, when used, shall be declared in the manner set forth in § 102.5(b)(2).

*See* 21 C.F.R. § 102.33(d) (emphasis add-ed). In addition to that which is explained in 21 C.F.R. §§ 102 *et seq.*, the FDA

adopted regulations concerning the use of the word "flavored" for all foods generally, and provides that a food may be described as "flavored" with natural flavor derived from a "characterizing" ingredient, even if little of the "characterizing" ingredient is actually present in the food. 21 C.F.R. § 101.22(i)(1)(i) explains:

> If the food is one that is commonly expected to contain a characterizing food ingredient ... and the food contains natural flavor derived from such ingredient and an amount of characterizing ingredient insufficient to independently characterize the food, or the food contains no such ingredient, the name of the characterizing flavor ... shall be immediately followed by the word *'flavored'*
> . . . .

*See* 21 C.F.R. § 101.22(i)(1)(i) (emphasis added).

Finally, in the 1993 Final Rules, the FDA considered whether fruit vignettes on juice labels have the potential to mislead the public, and whether such vignettes shall be FDA-regulated. *See* 58 Fed. Reg. 2897, at 2919–22. The FDA concluded:

> The agency did not [referring to previous proposals] propose a specific requirement regarding the relative amounts of the various fruits depicted in a label vignette but solicited comments on whether it should require that the vignette accurately reflect the quantity of the fruit present or the taste of the product, or whether some other requirement is appropriate ... The agency agrees that it is not always necessary that the label of a multiple-juice beverage depict each juice in a vignette. The agency believes that a vignette that pictures only some of the fruit or vegetables in the beverage *would not be misleading where the name of the food adequately and appropriately describes the contribution of the pictured juice.* For example, a 100 percent juice prod-

uct consisting of apple, grape, and raspberry juices, in which the raspberry juice provides the characterizing flavor, a vignette depicting raspberries would not necessarily be misleading if the statement of identity were "raspberry juice in a blend" or "raspberry juice in a blend of two other juices, 3 to 8 percent raspberry juice." Moreover, if these three juices were in a beverage containing 50 percent total juice, a vignette picturing raspberries would not be misleading in the presence of a name like "raspberry flavored juice beverage." Accordingly, *FDA is not requiring that vignettes depict the fruit or vegetables for all juices present.* However FDA believes that a vignette that pictures the fruit or vegetable sources of all juices present in a product would provide useful information and thus *encourages* manufacturers to use such vignettes.

*See* 58 Fed. Reg. 2897 at 2918–21 (emphasis added). Thus, in the 1993 Final Rules, the FDA concluded that in the context of multi-juice beverages, manufacturers are not required to depict all the fruits or vegetables in vignettes. *Id.* at 1921–22. Instead, the FDA merely encouraged manufacturers to depict all fruits and vegetables present in the juice, as that would be instructive to consumers. Thus, in the context of vignettes on multi-juice beverages, the 1993 Final Rules reflect the FDA's position that it is an agency specifically tasked with regulating names and labels in order to prevent the misbranding of products. *Id.*

### 2. Interplay Between the Lanham Act and the FFDCA

In light of the distinction between the Lanham Act and the FFDCA, and their remedial mechanisms, a line of cases has arisen finding that Lanham Act claims are barred where private litigants ask the

court to determine preemptively how the FDA will interpret and enforce its own regulations. *See Mutual Pharm. Co. v. Ivax Pharm., Inc. ("Mutual I")*, 459 F.Supp.2d 925, 933 (C.D.Cal.2006). This interplay between the Lanham Act and the FFDCA, therefore, requires "courts [to] ... tread carefully when applying the Lanham Act to advertising of goods ... that are also subject to regulation by the FDCA, lest it be used as a vehicle to accomplish indirectly something a party could not accomplish directly." *Id.*

■ On one hand, "[c]ourts have refused to allow a Lanham Act claim to proceed where, in order to determine the falsity or misleading nature of the representation at issue, the court would be required to interpret and then apply FFDCA statutory or regulatory provisions." *Mutual I*, 459 F.Supp.2d at 934 (citing *Sandoz Pharm. Corp. v. Richardson–Vicks, Inc.*, 902 F.2d 222, 231 (3d Cir.1990)); *see Cottrell*, 191 F.3d at 1255; *see also All One God Faith, Inc. v. The Hain Celestial Group, Inc.*, 2009 WL 4907433 (N.D.Cal. Dec. 14, 2009). "Simply put, the Lanham Act does not allow a federal court to determine preemptively how a federal agency will interpret and enforce its own regulations." *Summit Tech.*, 922 F.Supp. at 306 (citing *Sandoz Pharm. Corp.*, 902 F.2d at 231); *see Summit Tech., Inc. v. High–Line Med. Instruments, Co. ("Summit II")*, 933 F.Supp. 918, 933 (C.D.Cal.1996) (refusing to allow a Lanham Act claim to proceed where the claim would force the court to rule directly on the legality of the defendant's conduct before the FDA had a chance to do so). This is especially true "in light of Congress' intention to repose in [the FDA] the task of enforcing the FDCA." *Braintree Lab., Inc. v. Nephro–Tech., Inc. ("Braintree")*, 1997 WL 94237, *6 (D.Kan. Feb. 26, 1997). "It is in this context that many courts have refused to allow a Lanham Act claim to proceed, as the alleged 'falsity' is not something that is

verifiable without ... interpretation and application of FDA regulations." *Id.* at 936; *see also Sandoz Pharm. Corp.*, 902 F.2d at 231 (refusing to adjudge falsity of a cough syrup label when "the FDA ha[d] not found conclusively that [the product was mislabeled]" because doing so would require original interpretation of the FFDCA or its regulations). As the court in *Mutual I* concluded:

> If the allegedly false or misleading nature of the statement can be easily verified, then the fact that the determination of the truth of that statement was made by the FDA is immaterial so long as the party can also show the other requirements for establishing a Lanham Act claim, that is, that the false or misleading statement is likely to deceive consumers.

*Mutual I*, 459 F.Supp. at 935. In *American Home Products Corp. v. Johnson & Johnson*, the court similarly concluded that FDA approval was a defense to a competitor's Lanham Act claim. *American Home Prods. Corp. v. Johnson & Johnson*, 672 F.Supp. 135, 145 (S.D.N.Y. 1987). The court held that "[i]f FDA approval of the precise label used by a drug manufacturer is a defense to a consumer's product liability action, it should be a *fortiori*, a defense to a competitor's action under the Lanham Act." *Id.*

■ "On the other hand, the simple fact that a matter touches upon an area dealt with by the FDA is not a bar to proceeding with a claim under the Lanham Act." *Ocean Spray*, 642 F.Supp.2d at 1118 (citing *Mutual I*, 459 F.Supp.2d at 935). For example, a Lanham Act claim may proceed where a plaintiff alleges that the defendant has affirmatively misrepresented compliance with FDA regulations, or where a court would only need to "verify whether defendant's specific label or conduct conforms to what the FDA has al-

ready determined is required." *Id.; see also Braintree,* 1997 WL 94237, *6 (holding that "[m]ost obviously, a false statement of FDA approval is sanctionable"); *see also Cytosport,* 2007 WL 1345379 at *2 (holding that "courts have refused to dismiss Lanham Act claims when plaintiffs can establish that the statements at issue are false or misleading without relying on the FDCA or FDA regulations"). To this end, preclusion of a Lanham Act claim will likely rest on "whether the false advertising involves a fact that can be easily verifiable, without requiring the truth of the fact to be determined by the FDA." *Ocean Spray,* 642 F.Supp.2d at 1118 (internal citation omitted).

■ Moreover, some courts have concluded that "false statements are actionable under the Lanham Act, even if their truth may be generally within the purview of the FDA." *Cytosport,* 2007 WL 1345379, at * 2 (citing *Summit II,* 933 F.Supp. at 933); *see Cottrell,* 191 F.3d at 1256; As the court in *Summit Tech.* explained, "a plaintiff may bring a Lanham Act cause of action for affirmatively misrepresenting facts, even if the facts may be governed by FDA regulations." *Summit Tech.,* 922 F.Supp. at 307; *see also Pfizer, Inc.,* 868 F.Supp. at 449 (holding that literally false statements concerning areas of the FDA's purview can be actionable under the Lanham Act).

In *Grove Fresh Distributors, Inc. v. The Flavor Fresh Foods, Inc.,* the defendants sold orange juice labeled as "100% Orange Juice from Concentrate." *Grove Fresh,* 720 F.Supp. 714, 715 (N.D.Ill.1989). The plaintiff sued under the Lanham Act, "asserting that because defendants' product was not 100% orange juice, its labeling was false and misleading." *Summit Tech.,* 922 F.Supp. at 307. The court found that plaintiff's claim was not an FFDCA cause of action "because, even without the FDA's orange juice definition, plaintiff could still establish a violation of [the Lanham Act]— indeed, the commercial definition of pure orange juice could be determined without *any* reference to FDA regulations." *Id.* The plaintiff could "rely on the FDA regulation merely to establish the standard or duty which [the] defendants allegedly failed to meet. Nothing prohibit[ed] [the plaintiff] from using the FDCA or its accompanying regulations in this fashion." *Id.* Likewise, in *Summit II,* the plaintiff argued that the defendant's imported products were improperly labeled because they were labeled as "identical" to domestically manufactured products that were FDA-approved. *Summit II,* 933 F.Supp. at 933. The court declined to dismiss the action because "the question of whether the domestic and international [products] are 'identical' is a factual one that can be resolved without the interpretation or application of FDA regulations." *Id.*

Similarly, in *Cytosport,* the court concluded that it would "not need to rely on the FFDCA or any FDA regulation to show that the statement 'Carb Conscious' is misleading." *Cytosport,* 2007 WL 1345379 at *3. Specifically, the court would not need to interpret or otherwise apply FFDCA or FDA regulations. *Id.* "To make its case, [the plaintiff] [could] present evidence, such as consumer surveys, that indicate consumers would consider such statement misleading when [the product] contains 15 grams of carbohydrate." *Id.* The court in *Mutual I,* therefore, concluded that it could distinguish between instances where courts "find either as a matter of common sense or normal English, that which the FDA, with all of its scientific expertise, has yet to determine … [and instances where] the [FDA] should be given the first chance to exercise that discretion or to apply that discretion." *Mutual I,* 459 F.Supp.2d at 938.

### 3. Establishing Advertising under the Lanham Act Is Misleading

Assuming a Lanham Act claim is not precluded by the FFDCA or FDA regulations, "in order to recover damages, ... the plaintiff must demonstrate that it has been damaged by actual consumer reliance on the misleading statements." *Emerging Material Tech., Inc. v. Rubicon Tech., Inc.*, 2009 WL 5064349, *4 (N.D.Ill. Dec. 14, 2009). Here, the statements-at-issue, namely Coca Cola's naming, labeling, advertising, and marketing, are not alleged to be literally false, but rather, misleading in context. Thus, "[w]here a statement is not literally false and is only misleading in context, ... proof that the advertising actually conveyed the implied message and thereby deceived a significant portion of the recipients becomes critical." *Mut. Pharm. Co. II*, 2009 WL 3401117 at *3 (citing *The William H. Morris Co. v. Group W, Inc.*, 66 F.3d 255, 258 (9th Cir. 1995)); *see Del Webb*, 2009 WL 3053709 at * 13; *see Sandoz Pharm. Corp.*, 902 F.2d at 228–29 (context is important in evaluating the message conveyed); *see also Merck Consumer Pharm. Co. v. Smithkline Beecham Corp.*, 960 F.2d 294, 297–98 (2d Cir.1992) (requiring plaintiff to demonstrate that a "statistically significant part of the commercial audience holds the false belief allegedly communicated by the challenged advertisement"). Indeed, "[e]ven if an advertisement is not literally false, relief is available under [the] Lanham Act § 43(a) if it can be shown that the advertisement has misled, confused, or deceived the consuming public." *Southland Sod Farms*, 108 F.3d 1134 at 1140.

"Reactions of the public are typically tested through the use of consumer surveys." *Southland Sod Farms*, 108 F.3d 1134 at 1140; *see also* J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 27:55 (4th ed. 1996) ("If the ad is not clear, plaintiff must produce evidence, usually in the form of market research or consumer surveys, showing exactly what message ordinary consumers received from the ad .... [T]he moving party must provide expert testimony or other evidence.") (internal citations omitted). "To assess the truth of [the] more amorphous, [or] misleading statements, the courts favor testing by consumer reaction surveys, but have also found falsity based on their own independent reaction and the reaction of witnesses testifying before the court, including testimony based on test results, consumer surveys, complaints received, allegations of more than a few instances of misrepresentation and otherwise." *Cottrell*, 191 F.3d at 1252. In *Cottrell*, the Tenth Circuit concluded that "if [the plaintiff] can establish by consumer surveys or other means that [the defendant's] advertising is likely to confuse or actually confuses consumers, then the effect of the false 'implication' of EPA approval that [the plaintiff] now assumes could be as damaging for Lanham Act purposes as an express false claim of EPA approval." *Id.* at 1256; *see also Mut. Pharm. Co. II*, 2009 WL 3401117 at *3 (holding that the plaintiff did not need to rely on the FDCA or any FDA regulations in order to determine whether a statement was misleading, and instead, could "present evidence, such as consumer surveys, to indicate [that] consumers would consider [said] statement misleading"). However, "[t]o prove that use of [a] particular marketing channel conveys such a false impression ... [the plaintiff] cannot ... obtain relief by arguing how consumers could react; *it must be shown how consumers actually do react.*" *Mutual I*, 459 F.Supp.2d at 940 (internal citations omitted) (emphasis added). Similarly, in *Sandoz*, the Third Circuit concluded:

A Lanham Act plaintiff ... is not entitled to the luxury of deference to its judgment. Consequently, where advertisements are not literally false, plaintiff

bears the burden of proving the actual deception by a preponderance of the evidence. Hence, [a plaintiff] cannot obtain relief by arguing how consumers could react; it must show how consumers actually do react ... The effect of the advertisement on the consumer is the critical determination, and it must be demonstrated by a Lanham Act plaintiff regardless of whether the claim is facially ambiguous.

*Sandoz,* 902 F.2d at 228–29. However, "[s]ubjective claims about products, which cannot be proven either true or false, are not actionable under the Lanham Act." (*Cytyc Corp. v. Neuromedical Sys., Inc.,* 12 F.Supp.2d 296, 300 (S.D.N.Y.1998)) (citing *Lipton v. Nature Co.,* 71 F.3d 464, 474 (2d Cir.1995)), and "[a]s a general rule, summary judgment is inappropriate where an expert's testimony supports the nonmoving party's case." *Southland Sod Farms,* 108 F.3d at 1144.

In any event, the "failure to establish that a significant number of consumers [are] actually deceived is not necessarily fatal to [a plaintiff's] case. If [the defendant has] intentionally misled consumers, [the court will presume that] consumers were in fact deceived and [the defendant] would have the burden of demonstrating otherwise." *The William H. Morris Co. v. Group W, Inc.,* 66 F.3d 255, 258 (9th Cir. 1995); *see Del Webb,* 2009 WL 3053709 at *13; *see also Novartis Consumer Health, Inc. v. Johnson & Johnson,* 290 F.3d 578, 594 (3d Cir.2002). Indeed, where a defendant "intentionally misl[eads]" consumers, by "deliberate conduct of egregious nature," courts may presume that consumers have been deceived. *William H. Morris Co.,* 66 F.3d at 258; *see also Gonzalez v. Allstate Ins. Co.,* 2005 WL 5891935, *10 (C.D.Cal. Aug. 2, 2005). Accordingly, even if Pom cannot establish by a preponderance of evidence that consumers were actually deceived by Coca Cola's allegedly misleading statements, if Pom can estab-

lish willful misconduct by Coca Cola, then the Court may presume that consumers have been deceived.

### C. *The State Law Claims*

Since this Court's September 15, 2009 Order, several other courts in the Central District have addressed the issue of whether Pom has standing to assert similarly pled state law claims, and which the Court finds compelling. *See Pom Wonderful LLC v. Tropicana Products, Inc., et al.* ("*Tropicana*"), CV 09–00566 DSF (CTx) (C.D.Cal. Oct. 21, 2009); *Pom Wonderful LLC v. Welch Foods, Inc.* ("*Welch*"), CV 09–00567 AHM (AGRx), (C.D.Cal. Dec. 21, 2009). Specifically, to have standing under California Business & Professions Code § 17200, referred to as California's Unfair Competition Law ("UCL"), and California Business & Professions Code § 17500, referred to as California's False Advertising Law ("FAL"), Pom must show that it has suffered an injury in fact, namely that it has "lost money or property as a result of ... unfair competition." Cal. Bus. & Prof. Code §§ 17204, 17535. "[L]ost money or property" have been interpreted as requiring that a plaintiff show he is entitled to restitution from a defendant. *See Citizens of Humanity, LLC v. Costco Wholesale Corp.,* 171 Cal.App.4th 1, 89 Cal.Rptr.3d 455, 472 (2009) (holding that the alleged harm to a plaintiff's goodwill is not a loss of "money or property as a result of the unfair competition," and is insufficient to confer standing on the plaintiff); *see also Buckland v. Threshold Enterprises, Ltd.,* 155 Cal.App.4th 798, 66 Cal.Rptr.3d 543, 557–58 (2007) (holding that a plaintiff's purchase of goods which was made expressly in order to establish standing for an action in the public interest was "not reasonably viewed as lost money or property under the standing requirement").

In *Korea Supply Corp. v. Lockheed Martin Corp.,* the California Supreme

Court held that for purposes of California's UCL, restitution is not "limited only to the return of money or property that was once in the possession of that person." *Korea Supply Corp. v. Lockheed Martin Corp.,* 29 Cal.4th 1134, 131 Cal.Rptr.2d 29, 42, 63 P.3d 937 (2003). Specifically, the California Supreme Court held that "restitution is broad enough to allow a plaintiff to recover money or property in which he or she has a vested interest." *Id.* Thus, although earned "wages [can] be recovered as restitution under the UCL," a lost business opportunity, which is only an "attenuated expectancy interest," and not subject to a constructive trust, is not a vested interest, and cannot be recovered under the UCL as restitution. *Id.* The court further noted: "As the United States Supreme Court recently said, a constructive trust requires 'money or property identified as belonging in good conscience to the plaintiff [which can] clearly be traced to particular funds or property in the defendant's possession.'" *Id.* (citing *Great–West Life & Annuity Ins. Co. v. Knudson,* 534 U.S. 204, 213, 122 S.Ct. 708, 151 L.Ed.2d 635 (2002)).

■ Here, it has been shown that Pom is not entitled to restitutionary relief. Specifically, it is clear that Pom has no vested share of the pomegranate juice market, or a vested interest in Coca Cola's profits from the Juice. As Judge Dale S. Fischer succinctly explained in *Tropicana,* "there is no reasonable definition of vested interest that would include market share." *Tropicana,* CV 09–00566, at 2. Similarly, Judge Howard A. Matz concluded that "like the plaintiff in *Korea Supply,* Pom seeks to recover nonrestitutionary disgorgement of profits that are nothing more than a 'contingent expectancy of a payment from a third party'—in this case, consumers." *Welch,* CV 09–00567, at 5 (citing *Korea Supply Corp.,* 131 Cal. Rptr.2d at 42, 63 P.3d 937). Moreover, Pom is not entitled to seek injunctive relief

under the UCL and FAL, either. Indeed, as both Judge Dale S. Fischer and Judge Howard A. Matz noted, a restitutionary interest is required for standing, even if the plaintiff does not seek restitution as a remedy. *See Welch,* CV 09–00567, at 5; *see Tropicana,* CV 09–00566, at 2; *see Walker,* 558 F.3d at 1027. Because Pom's state law claims are strikingly similar to those it has pled in the above-mentioned cases, and because the Court finds Judge Howard A. Matz and Judge Dale S. Fischer's reasoning to be compelling, Coca Cola's summary adjudication as to this issue is GRANTED.

Accordingly, Coca Cola's Motion is **GRANTED IN PART** to the extent that Pom's state law claims are **DISMISSED.** Pom's Motion is **DENIED** as moot to the extent that it seeks to preclude Coca Cola's affirmative defenses against its state law claims.

### D. *The Lanham Act Claim*
#### 1. *Naming and Labeling*

Principally, Pom contends that Judge A. Howard Matz, Judge Dean D. Pregerson, and Judge Dale S. Fischer, as well as this Court, "all got it right at the motion to dismiss stage that federal law does not preclude or preempt Pom's claims against juice product naming and labeling." (Pl.'s Opp'n 2.) To that end, Pom seeks to have this Court indirectly require that Coca Cola change the Juice's naming and labeling to reflect what Pom believes is a more appropriate naming and/or labeling of the Juice's bottle. (FAC ¶ 20.) Pom states:

Instead of calling its product "Apple Grape" juice, which are the two primary juices in its product, Coca Cola made a marketing decision to give this product the brand name "Pomegranate Blueberry" juice on the front label, and to juxtapose this brand name with a picture of a pomegranate and other fruits, among other misleading elements.

(FAC ¶ 20; Pl.'s Mot. 5.) Specifically, Pom alleges that Coca Cola's naming and labeling on the Juice's bottle is voluntary, and thus, Pom's claims are not directed at the features of the Juice's "formal" naming and labeling. (Pl.'s Opp'n 10; Pl.'s Mot. 5.) Pom argues therefore, that the Lanham Act claim is directed towards the Juice's naming and labeling, for "which [Coca Cola] chose in order to maximize the label's deceptive impact on consumers." (Pl.'s Opp'n 10.)

Coca Cola contends that the Juice's name, "Pomegranate Blueberry Flavored Blend Of 5 Juices," "complies with all applicable FDA regulations," and so, is precluded from being challenged by the Lanham Act. Def.'s Mot. 8; see 58 Fed. Reg. 2897 at 2920; see also 21 C.F.R. § 102.33 (stating that "this revision of new § 102.33 along with the others discussed below are adequate to prevent misleading labels on multiple-juice beverages"). In support of its contention that the Juice's naming and labeling comport with the relevant FFDCA and FDA regulations, Coca Cola states that the Juice's "name includes two identified juices, pomegranate and blueberry. Because these named juices are not the predominant juices by volume, the product name includes the word 'flavored,' as required by 21 C.F.R. § 102.33(d), and as expressly permitted by 21 C.F.R. § 101.22(i)(1)(i), based upon the inclusion of 'natural flavors' in the Juice." (Def.'s Mot. 8.) Coca Cola further maintains that "because there are additional juices in the product, the [Juice's] name also includes the word 'blend,' as required by 21 C.F.R. § 102.33(c)." (Def.'s Mot. 8.)

■■ This Court's previous Order held that Pom's Lanham Act claim against the Juice's formal name and label, "Pomegranate Blueberry Flavored Blend Of 5 Juices," "impermissibly challeng[es] the FDA's labeling for a multiple-juice beverage." (Order of Feb. 19, 2009). The FDA has directly spoken on the issues that form the basis of Pom's Lanham Act claim against the naming and labeling of the Juice, and has therefore, reached a conclusion as to what is permissible. See 21 C.F.R. §§ 102.33(c), (d). Indeed, the FDA has spoken on several occasions, and each time, it has concluded that manufacturers of multiple-juice beverages may identify their beverages with a non-primary, characteristic juice, as Coca Cola does here. See 56 Fed. Reg. 30452; see 58 Fed. Reg. 2897; see Holk v. Snapple Beverage Corp., 574 F.Supp.2d 447, 454 (D. New Jersey 2008), cited with disapproval in Lockwood v. Conagra Foods, Inc., 597 F.Supp.2d 1028, 1034 (N.D.Cal.2009) ("the FDA under the broad authority granted to it by the FFDCA, has promulgated comprehensive regulations pertaining to, inter alia, ... the common or usual name for diluted multiple-juice beverages or a product containing a blend of single-strength juices ...."). The rules promulgated by the FDA are intended to protect the public from unsafe or mislabeled products by setting forth federal labeling requirements, and with which the Juice's naming and labeling comply. Wyeth v. Sun Pharm. Indus., Ltd., 2010 WL 746394 (E.D.Mich. Mar. 2, 2010) (citing Wyeth v. Levine, —— U.S. ——, 129 S.Ct. 1187, 1195, 173 L.Ed.2d 51 (2009)). Thus, the name "Pomegranate Blueberry Flavored Blend Of 5 Juices" sufficiently comports with the requirements of 21 C.F.R. §§ 102.33(c),(d).

■■ Moreover, although the Juice's name appears in different fonts and on different lines, Pom has not provided the Court with evidence that the Juice's naming and labeling is not prominently displayed, and so not in compliance with 21 U.S.C. § 343(f).[21] See Wyeth v. Levine,

---

21. 21 U.S.C. § 343(f), entitled "Prominence    of information on label," provides: "If any

129 S.Ct. at 1197 ("The FDCA does not provide that a drug is misbranded simply because the manufacturer has altered an FDA-approved label; instead, the misbranding provision focuses on the substance of the label and, among other things, proscribes labels that fail to include 'adequate warnings.'"); *see Merrell Dow Pharm. Inc. v. Thompson*, 478 U.S. 804, 823–24, 106 S.Ct. 3229, 92 L.Ed.2d 650 (1986) ("a drug is 'misbranded' under the FDCA if 'the labeling or advertising *fails to reveal facts material* ... with respect to consequences which may result from the use of the article to which the labeling or advertising relates.'") (emphasis added) (internal citations omitted); *see Mensing v. Wyeth, Inc.*, 588 F.3d 603, 611 (8th Cir.2009) (holding that the misbranding provisions of the FDCA, 21 U.S.C. § 355(e), "focus on the accuracy of a product's label"); *see also* 21 U.S.C. § 352(f). Pom has not shown that the Juice's name must appear on one single line, must be in one font, or must be centrally located on the Juice's bottle, in order to avoid being branded mislabeled, or that as a consequence of these aesthetic features, the Juice's naming and labeling is not prominently displayed. *See* 21 U.S.C. § 343(f); *see generally* Pl.'s Opp'n; *see* 58 Fed. Reg. 2897, at 2902–03; *see also Braintree*, 1997 WL 94237, *6. Instead, all that 21 U.S.C. § 343(f) requires is that Coca Cola prominently place the label on the Juice's bottle, and which Coca Cola does sufficiently. *See* 21 U.S.C. § 343(f).

■■ In any event, any such determination that naming and labeling must be displayed in a particular way or fashion, as Pom suggests, would necessarily be for the FDA to determine, and so, is not for this Court to construe or interpret. *See Braintree*, 1997 WL 94237 at *6. Thus, because "Pomegranate Blueberry Flavored Blend Of 5 Juices" complies with the relevant FDA regulations and is prominently displayed on the Juice's front panel, pursuant to 21 U.S.C. § 343(f), even if not to the liking of Pom, this Court cannot conclude that the Juice's naming and labeling is misleading, inaccurate, or outside the purview of the FDA.

Of course, "Pom is free to lobby Congress or petition FDA to change its rules ...." Def.'s Opp'n 2; *see also American Home Prods. Corp.*, 672 F.Supp. at 145 ("If the intercession of a private attorney general is needed to press the FDA to perform that duty with respect to a particular product label, the quickest and most effective relief could be obtained through a direct petition to the agency and not through an unfair competition action against the manufacturer ... There is no apparent reason why [the plaintiff] cannot ask the FDA to reconsider that approval in light of the survey evidence it has presented here to show the message users take from ... [the defendant's] package.") As a private litigant, Pom cannot seek to have this Court indirectly attack FDA regulations as courts may not be used to second-guess the considered judgments of the FDA.[22] *Cytyc*, 12 F.Supp.2d at 301 (con-

---

word, statement, or other information required by or under authority of this chapter to appear on the label or labeling is not *prominently placed* thereon with such conspicuousness (as compared with other words, statements, designs, or devices, in the labeling) and in such terms as to render it likely to be read and understood by the ordinary individual under customary conditions of purchase and use." 21 U.S.C. § 343(f) (emphasis added).

**22.** Pom argues that *Cytyc* is distinguishable from the facts of this case because the FDA has not expressly approved of the Juice's naming or labeling. (Pl.'s Opp'n 12.) However, the Court finds *Cytyc* compelling because the court in *Cytyc* similarly dealt with "statements that [did] not correspond precisely to statements that the FDA ha[d] approved." *Cytyc*, 12 F.Supp.2d at 301. In any event, the court concluded that "the challenged statements discussed above [were] similar enough to the approved statements for

cluding that FDA approval of statements is a defense to a competitor's Lanham Act claim). Coca Cola may name the Juice a blend or a flavor since such language is expressly permitted (required here) by the FDA, even if pomegranate and/or blueberry are merely characteristic, rather than primary juices in the Juice. *See* 21 C.F.R. §§ 102.33(c), (d). Pom's challenge to the Juice's name and label, "Pomegranate Blueberry Flavored Blend Of 5 Juices," on the Juice's bottle, is therefore, barred. *Id.*

Accordingly, because Coca Cola's naming and labeling of the Juice comports with the relevant FFDCA and FDA regulations, Coca Cola's Motion is **GRANTED IN PART** to the extent that Pom is precluded from pursuing its Lanham Act claim against the naming and labeling on the Juice's bottle. Similarly, Pom's Motion is **DENIED** as moot to the extent that Pom seeks to bar Coca Cola from presenting evidence that the Juice's naming and labeling comply with FDA regulations.

### 2. The Fruit Vignette

Pom contends that the imagery on the Juice's bottle's front panel, which includes the Fruit Vignette, intentionally misleads consumers. (Pl.'s Opp'n 11; Def's Statement in Opp'n ¶ 2.) Specifically, because the centrally-placed Fruit Vignette includes a large half-open pomegranate, Pom argues that consumers will incorrectly believe that the Juice consists primarily of pomegranate juice. (Pl.'s Opp'n 11; Torrey Decl. Ex. 1; Def's Statement in Opp'n ¶ 2.) In response, Coca Cola contends that because the Fruit Vignette complies with FDA regulations, Pom is necessarily precluded from alleging that the Fruit Vignette violates the Lanham Act. (Def.'s Mot. 8.)

In the FDA's 1993 Final Rules, whereby the FDA discussed the depiction of fruits on a label vignette, the FDA expressed the belief that vignettes depicting pictures of the fruit or vegetable sources of all juices present in a product would be useful to consumers, and so encouraged manufacturers to use vignettes. *See* 58 Fed. Reg. 2897 at 2918–21; *see Ocean Spray*, 642 F.Supp.2d at 1119–20. The fact that the FDA discussed vignettes within the context of juice labels suggests that vignettes are related to and/or part of a juice's label. Specifically, the FDA stated that "a vignette that pictures only some of the fruit or vegetables in the beverage would not be misleading where the name of the food adequately and appropriately describes the contribution of the pictured juice." *See* 58 Fed. Reg. 2897 at 2918–21. Indeed, it is generally a juice's name, as well as the vignette, that instructs consumers as to what a juice contains. Thus, it would be inconsistent, if not nonsensical, for the FDA to say that a determination of whether a juice's naming and labeling is misleading depends on the interplay between a juice's naming and labeling, and any accompanying vignette, but that it, nonetheless, declines to regulate such vignettes. Rather, because vignettes are intricately related to a determination of whether a juice label and/or name is misleading, vignettes, like the Fruit Vignette, are within the FDA's purview.

To that end, the example used by the FDA in its 1993 Final Rules indicates that the Fruit Vignette clearly complies with FDA requirements relating to the depiction of vignettes. *See* 58 Fed. Reg. 2897 at 2918–21. Specifically, the FDA indicated that for a "100 percent juice product consisting of apple, grape, and raspberries, in which the raspberry juice provides the characterizing flavor," it would not be misleading if the vignette depicts only raspberries, as long as "the statement of identity [is] 'raspberry juice

---

the court to conclude, as a matter of law, that

they are neither false not misleading." *Id.*

in a blend,' or 'raspberry juice in a blend of two other juices, 3 to 8 percent raspberry juice.'" *See* 58 Fed. Reg. 2897 at 2918–21. Here, the Juice is identified as a "Blend," such that Coca Cola's statement of identity adequately and appropriately identifies pomegranate and blueberry as merely characterizing flavors. Thus, because the Fruit Vignette in fact depicts all of the juices in the Juice, as opposed to only "some" of the juices (i.e., blueberries and/or pomegranates), Coca Cola has seemingly provided more information and identification for consumers than is even required by the FDA. Pursuant to the FDA's 1993 Final Rules, the Fruit Vignette is, therefore, clearly not misleading.

Subsequent to the FDA's 1993 Final Rules, a handful of courts have looked at whether the FDA is tasked with regulating fruit vignettes on products, and in each instance, the court has concluded that the regulation of vignettes comes within the FDA's purview. *See R. McKinnis v. Kellogg, USA,* 2007 WL 4766060, *4 (C.D.Cal. Sept. 19, 2007); *see Holk v. Snapple Beverage Corp.,* 574 F.Supp.2d at 454.[23] Although *R. McKinnis* pertains to state law claims, and so is distinguishable from the facts before this Court, *R. McKinnis* concluded that fruit vignettes are FDA-regulated:

> For one, the depiction of fruit on a product label is not a specific affirmation that a product contains any fruit at all. *FDA regulations permit illustrations of fruit on product label[s]* to indicate that product's 'characterizing flavor,' even

where the product contains no ingredients derived from the depicted fruit .... Froot Loops contains 'ALL NATURAL FLAVORS' of lime, orange, lemon, cherry, raspberry, and blueberry, as disclosed in the ingredients panel, rendering any depiction of fruit 'vignettes' on the box entirely accurate and permissible under FDA regulations.

*R. McKinnis,* 2007 WL 4766060 at *4 (emphasis added).

Accordingly, because the depiction of vignettes on multi-juice beverages is an area of regulation within the FDA's purview, as the FDA's 1993 Final Rules and subsequent caselaw reflect, and because the Fruit Vignette is clearly not misleading pursuant to the FDA's 1993 Final Rules, Coca Cola's Motion is **GRANTED IN PART** to the extent that Pom is precluded from pursuing its Lanham Act claim against the Fruit Vignette. Similarly, Pom's Motion is **DENIED** as moot to the extent that Pom seeks to bar Coca Cola from presenting evidence that the Fruit Vignette complies with FDA regulations.

### 3. *Advertising and Marketing*

#### a. Consumer Confusion

■ This Court previously concluded that Pom is not prevented from alleging that Coca Cola "has otherwise advertised and marketed [the Juice] in a misleading manner ..." (Order of Sept. 15, 2009.) Coca Cola "fully accepts, and does not contest ... that advertising apart from the Juice's formal name and label is subject to

---

**23.** Although the court in *Holk* concluded that the "FDA, under the broad authority granted to it by the FFDCA, has promulgated comprehensive regulations pertaining to ... (4) label depictions by 'vignette or other pictorial representation' on products," *Lockwood* expressly stated that it was "not persuaded by [*Holk*]." *See Lockwood,* 597 F.Supp.2d at 1034; *see Holk,* 574 F.Supp.2d at 454. In any event, the Court cites *Holk* because it is one of only a few courts that has directly dealt with the issue of whether vignettes come within the purview of the FDA, and because *Lockwood* did not expressly or directly conclude that fruit vignettes are outside the purview of the FDA. *See Lockwood,* 597 F.Supp.2d at 1034. Rather, *Lockwood* merely indicated that the FDA's reach is not as extensive or as exhaustive as *Holk* concluded. *Id.*

challenge under [the] Lanham Act." (Def.'s Mot. 14.) As such, it is critical that Pom show "proof that the advertising actually conveyed the implied message and thereby deceived a significant portion of the recipients." *The William H. Morris Co.*, 66 F.3d at 258. As in *Gonzalez*, whether Coca Cola's advertising and marketing has a tendency to deceive a substantial segment of the relevant audience is a disputed question of fact. *Gonzalez*, 2005 WL 5891935, *9.

■ "The party offering a survey as proof of consumer confusion bears the burden of proving its reliability." *Pfizer, Inc.*, 868 F.Supp. at 447. To that end, Pom alleges that "[t]he 35% differential which the Field Survey found between the test and control groups' respective belief that the Juice only contains pomegranate and blueberry juice far exceeds the percentage that district courts typically find acceptably for a consumer survey in support of a Lanham Act claim." Decl. of Steven A. Zalesin ("Zalesin Decl.") Ex. 1; Pl.'s Opp'n 5; *see Novartis Consumer Health, Inc.*, 290 F.3d at 594 (finding that 15.5% would be sufficient to support a finding of substantial consumer confusion). The Field Survey provides some evidence of consumer deception. (Zalesin Decl. Ex. 1.) Pom contends that the Field Survey directly demonstrates the generally misleading effect that the Juice has on consumers, such that consumers are likely "to believe that the Juice *mainly* contains pomegranate and blueberry juice (and not other types of fruit juice)." (Zalesin Decl. Ex. 1; Pl.'s Addt'l SOF ¶¶ 32–33.)

Coca Cola "hotly disputes the methodology and conclusions of [the Field Survey]." (Def.'s Mot. 17; Decl. of Dr. Ran Kivetz in Supp. of Def.'s Mot. for Summ. J. ("Kivetz Decl.") ¶ 2.) Coca Cola argues that "Pom has not identified a shred of evidence that any of [Coca Cola's] ads are false or misleading in any respect," and so "Pom has offered no evidence that [Coca Cola's] website or ads have misled consumers." (Def.'s Mot. 14; Def.'s Reply 5.) As such, Coca Cola contends that because the Field Survey fails to address Coca Cola's advertising or marketing, and instead, only addresses the Juice's name and label, it is "unreliable." (Def.'s Reply 3; Kivetz Decl. ¶ 3, Ex. A.) Specifically, Coca Cola states that "[t]he only stimulus shown to the survey participants was the bottle and label of the Juice," and so the Field Survey "did not attempt to evaluate the messages conveyed by the Juice's website of any of [Coca Cola's] other advertising." (Def.'s Mot. 3–4; *see generally* Kivetz Decl. Ex. A.)

■ The Ninth Circuit holds that "surveys in trademark cases are to be admitted as long as they are conducted according to accepted principles ... [Moreover,] [t]echnical reliability goes to the weight accorded a survey, not its admissibility." *CKE Rest.*, 494 F.Supp.2d at 1144 (citing *E.J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1292 (9th Cir.1992)); *see also Pfizer, Inc.*, 868 F.Supp. at 447 ("The probative value of a survey depends entirely upon its fundamental fairness and objectivity, which in turn depends on many factors, such as whether it is properly 'filtered' to screen out those who got no message from the advertisement, whether the questions are directed to the real questions, and whether the questions are leading or suggestive."). Furthermore:

> The weight and evidentiary value of a survey's results rest upon the underlying objectivity of the survey itself. This objectivity, in turn, depends upon many factors, such as whether [the survey] is properly filtered to screen out those who got no message from the advertisement whether the questions are directed to the real issues, and whether the questions are leading or suggestive.

*CKE Rest.,* 494 F.Supp.2d at 1144 (citing *Johnson & Johnson Merck Consumers v. Smithkline Beecham Corp.,* 960 F.2d 294, 300 (2d Cir.1992)). Any deficiencies cited by Coca Cola regarding the Field Survey, therefore, "weaken the relevance and credibility of the survey evidence." *CKE Rest.,* 494 F.Supp.2d at 1144. Accordingly, the Field Survey is seemingly unreliable for the reasons articulated by Defendant. In particular, the Field Survey does not appear to relate to Coca Cola's advertising and marketing, and only implicates the naming and labeling of the Juice bottle. (Jay Decl. Ex. A.) However, whether the Field Survey actually meets the *Daubert* standards is best considered at trial.

### b. Willful Deception

In any event, even if the Field Survey is defective as to the advertising and marketing claim, if Pom has other evidence of consumer deception, or if Pom can show that Coca Cola intentionally misled consumers, the burden may shift to Coca Cola to demonstrate otherwise. *See The William H. Morris Co.,* 66 F.3d at 258.

Coca Cola, however, contends that Pom cannot "circumvent the consumer survey requirement by arguing that [Coca Cola's] false advertising is 'willful' and 'thus inherently establishes that consumers are substantially deceived.'" (Def.'s Reply 4; Pl.'s Opp'n 18.) Coca Cola argues that Pom's evidence of alleged "willful deception" does not relate to its website or advertisements for the Juice. (Def.'s Reply 4–5.) First, Coca Cola states that the Reid correspondence, referred to by Pom as a "smoking gun," relates solely to the Juice's name, not its advertising, marketing, or website. (Def.'s Reply 5.) Coca Cola further notes that the Reid correspondence illustrates Coca Cola's desire to comply with FDA regulations, and so, does not evidence an egregious or willful intent to deceive. (Def.'s Reply 5.) Finally, Coca Cola argues that the consumer complaints cited by

Pom are based on consumers who bought the Juice in stores, not consumers who viewed the website or Coca Cola's other advertising media. (Def.'s Reply 5.)

Coca Cola's claims are seemingly meritorious. However, the Court concludes that Pom should have the opportunity to demonstrate otherwise. Accordingly, drawing all inferences in favor of Pom as this Court must, the Court concludes that triable issues of material fact remain as to Pom's advertising and marketing claims.

### III. *RULING*

For the foregoing reasons, Coca Cola's Motion is **GRANTED IN PART** and **DENIED IN PART,** and Pom's Motion is **DENIED.**

IT IS SO ORDERED.

United States District Court, C.D. California.